KENRO, INC., on behalf of itself and all others similarly situated, Plaintiff,

v.

FAX DAILY, INC., and Huntington National Bank of Indiana d/b/a Huntington Banks on behalf of itself and all others similarly situated, Defendants.

No. IP 95–1077–C–B/S.

United States District Court, S.D. Indiana.

April 10, 1997.

Irwin B. Levin, Cohen & Malad, Indianapolis, for Plaintiff.

Adam Arceneaux, Ice Miller Donadio & Ryan, Indianapolis, Christopher H. Belch, Roach Lynch & Belch, Indianapolis, Russel Jones, Carmel, for Defendants.

## *ENTRY*

BARKER, Chief Judge.

In this entry, the Court resolves a number of pending motions in the above-referenced action: 1) Kenro's request that the Court reconsider its decision in *Kenro, Inc. v. Fax Daily, Inc.*, 904 F.Supp. 912 (S.D.Ind.1995), in which we held that federal courts have federal question subject matter jurisdiction over actions brought under the TCPA; 2) defendant Huntington National Bank's ("Huntington") motion to dismiss, based upon the alleged unconstitutionality of certain provisions of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. §§ 227(b)(1)(C) and (b)(3)(B); 3) Kenro's petition for class certification; and 4) defendant Fax Daily's motion to dismiss for failure to state a claim. For the reasons discussed below, each of these motions and/or requests is **denied.**

## *I. PROCEDURAL BACKGROUND*

On July 14, 1995, Kenro filed a class action complaint in the Marion Superior Court alleging that defendants Fax Daily and Huntington violated the TCPA by transmitting by telephone facsimile machine ("fax") an unsolicited publication titled "Fax Daily," which contains unsolicited advertisements. On August 14, 1995, Huntington, with the consent of Fax Daily, removed this action to this Court pursuant to 28 U.S.C. § 1441(a), claiming that this court has federal question subject matter jurisdiction over the action pursuant to 28 U.S.C. § 1331. On November 8, 1995, this Court denied Kenro's motion to remand this action to state court, finding that this Court had federal question subject matter jurisdiction over the action pursuant to 28 U.S.C. § 1331, and that the action was therefore properly removed to federal court pursuant to 28 U.S.C. § 1441(a).

## II. ANALYSIS

### A. Kenro's Request That This Court Reconsider Its November 8, 1995 Ruling.

■ In our November 8, 1995 opinion denying Kenro's motion to remand, we held that Kenro's complaint alleged a violation of the TCPA, a federal law which expressly provides for a private cause of action, and that the complaint therefore presented a federal question, pursuant to 28 U.S.C. § 1331.. We interpreted language in the TCPA which provides that "a person . . . *may* if otherwise permitted by the laws or rules of court of a State, bring in an appropriate court of that State . . . [an action under the TCPA]" as providing for concurrent federal and state jurisdiction. 47 U.S.C. § 227(b)(3) (emphasis added). Noting that repeals by implication are not favored, we reasoned that if Congress had intended to provide for exclusive state jurisdiction, it would have done so with clear mandatory language, rather than using the permissive word "may".

On February 11, 1997, the Fourth Circuit Court of Appeals issued an opinion holding that the above-quoted language in the TCPA provides for exclusive state jurisdiction. *International Science & Technology Institute, Inc. v. Inacom Communications, Inc.*, 106 F.3d 1146 (4th Cir.1997). Kenro requests that we reconsider our November 8, 1995, decision in light of the Fourth Circuit's decision in *International Science*.

Recognizing that its conclusion that state courts have exclusive jurisdiction over a cause of action created by federal law was "somewhat unusual," *id.*, at 1149, the Fourth Circuit nonetheless explained that "when . . . the permissive authorization extends only to courts of general jurisdiction, that authorization cannot confer jurisdiction on unmentioned courts of limited jurisdiction, which require a specific grant." *Id.* at 1151. The TCPA itself need not confer jurisdiction on federal district courts, however, because that is done by 28 U.S.C. § 1331, which provides that "[t]he district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." The Fourth Circuit reasoned that the general federal question jurisdiction established in § 1331 is superseded when the federal law that creates a cause of action (here the TCPA) "manifest[s] a particular intent to assign the cause of action to courts other than district courts." *Id.* at 1155. After carefully considering the *International Science* decision, we respectfully disagree with the Fourth Circuit's interpretation of the TCPA and stand by our conclusion that, had Congress intended to supersede the federal question jurisdiction provided by § 1331 and instead provide for exclusive state court jurisdiction, it could and would have done so with clear language to that effect. *See, Kenro*, 904 F.Supp. at 915 ("we will not assume that the language in the TCPA providing for a private right of action in state court was meant to repeal federal question jurisdiction which exists under 28 U.S.C. § 1331."). Accordingly, Kenro's request that we reconsider our November 8, 1995 decision denying Kenro's motion to remand is denied.

### B. Huntington's Motion to Dismiss—Constitutionality of the TCPA.

Huntington contends that § 227(b)(3)(B) of the TCPA, which provides for damages measured by actual monetary loss or $500, whichever is greater, denies defendants judicial review with respect to the amount of damages, in violation of the Due Process Clause of the Fifth Amendment of the Constitution. Huntington also contends that § 227(b)(1)(C), which prohibits the use of "any telephone facsimile machine, computer, or other device to send an unsolicited advertisement to a telephone facsimile machine . . . .," is an unconstitutional prohibition of commercial speech under the First Amendment.

### 1. Due Process Challenge

■ Huntington claims that 1) by setting a minimum $500 damages award for violations of the TCPA, regardless of the amount of actual monetary damages, Congress has deprived defendants of any opportunity to contest the amount of damages awarded, and 2) the potential $500 award is excessive in relation to actual damages. The constitutionality of § 227(b)(3)(B) is a matter of first impression in the federal courts.

In support of its procedural argument, Huntington relies heavily upon the Supreme Court's decision in *Honda Motor Co., Ltd. v. Oberg,* 512 U.S. 415, 114 S.Ct. 2331, 129 L.Ed.2d 336 (1994), for the proposition that due process requires that judicial review or some other adjudicatory process be available to contest the amount of a damage award in relation to actual injury. Huntington's reliance on *Honda Motor* is misplaced, because *Honda Motor* addressed the specific question of "whether the Due Process Clause requires judicial review of the amount of *punitive* damage awards." 512 U.S. at 420, 114 S.Ct. at 2335 (emphasis added). In reaching its holding that a provision of the Oregon state Constitution prohibiting judicial review of punitive damages awarded by juries violated due process, the Supreme Court focused on the "acute danger of arbitrary deprivation of property" posed by the jury's "wide discretion in choosing amounts," the "potential that juries will use their verdicts to express biases against big businesses," and the possibility of "partiality" or "passion and prejudice" influencing the jury's award of punitive damages. *Id.,* at 424–28, 430–33, 114 S.Ct. at 2337–38, 2340–41. In other words, the *Honda Motors'* holding that judicial review was necessary for punitive damage awards set by juries was based largely on its concerns regarding the possible motivations and the broad discretion of juries. We decline to extend the holding of *Honda Motor* to require judicial review of statutorily prescribed damage awards that may exceed the amount of actual loss proven at trial.

Huntington is correct in asserting that the due process clause applies to statutorily prescribed compensatory damage awards as well as jury-determined punitive damage awards. However, "[a] statutorily prescribed penalty violates due process rights 'only where the penalty prescribed is so severe and oppressive as to be wholly disproportional to the offense and obviously unreasonable'." *United States v. Citrin,* 972 F.2d 1044, 1051 (9th Cir.1992) (quoting *St. Louis, I.M. & S. Ry. Co. v. Williams,* 251 U.S. 63, 66–67, 40 S.Ct. 71, 73, 64 L.Ed. 139 (1919)). The fact that the TCPA establishes as a remedy a damages award of $500, even when actual monetary damages is less than $500, does not itself make the award excessive and unreasonable. *See Williams,* 251 U.S. at 66, 40 S.Ct. at 73 (no requirement that statutory penalty "be confined or proportioned to his loss or damages; for, as it is imposed as a punishment for the violation of a public law, the Legislature may adjust its amount to the public wrong rather than the private injury ...") (citations omitted); *Franklin v. First Money, Inc.,* 427 F.Supp. 66, 72, n. 14 (E.D.La.1976) (noting that "Congress has not flinched, in other areas of the law, from exacting damages which do not necessarily reflect actual damages"), *aff'd,* 599 F.2d 615 (5th Cir.1979). In fact, statutorily-prescribed minimum damage awards are permissible even where there is no proof of any actual damages. *Scofield v. Telecable of Overland Park, Inc.,* 751 F.Supp. 1499, 1521 (D.Kan.1990) ("liquidated damages are properly awardable even without a showing of actual damages"–upholding Cable Communications Policy Act provision for liquidated damages of § 100/day per violation or § 1,000, whichever is higher), *reversed on other grounds,* 973 F.2d 874 (10th Cir.1992). The success of Huntington's due process challenge, therefore, depends on whether the $500 amount of damages prescribed by the TCPA is "so severe and oppressive as to be wholly disproportional to the offense and obviously unreasonable." We hold that it is not.

Huntington estimates actual monetary damages for violations of the TCPA to be as little as "a few pennies per alleged violation," [1] and argues that, therefore, TCPA's provision for a $500 damage award creates "the potential for 'horrendous, possibly annihilating punishment, unrelated to any damage to the purported class or to any benefit

---

**1.** Huntington bases this estimate upon evidence submitted in another TCPA case to the effect that "the cost of one page of paper used by the typical fax machine in use today is two and one-half cents," and "it takes between 30 and 45 seconds for a fax machine to print an 8–inch by 11–inch page of text." (See Huntington Brief; at 7, n. 7) *(quoting Destination Ventures, Ltd. v. Federal Communications Commission,* 46 F.3d 54, 56 (9th Cir.1995)). The evidence submitted in *Destination Ventures* is not properly before this Court on Huntington's motion to dismiss.

to defendant'." (Huron Brief at 6) (quoting *Forman v. Data Transfer, Inc.,* 164 F.R.D. 400, 405 (E.D.Pa.1995)). Huntington takes the above-quoted language from the *Forman* decision out of context when it argues that the damages provision in the TCPA is, itself "horrendous." *Forman* did not address the issue of the constitutionality of the damages provision in the TCPA. Rather, in support of its conclusion that "[a] class action would be inconsistent with the specific and personal remedy provided by Congress to address the minor nuisance of unsolicited facsimile advertisements," the *Forman* court parenthetically noted the decision in *Ratner v. Chemical Bank New York Trust Co.,* 54 F.R.D. 412, 416 (S.D.N.Y.1972) "denying class certification where the Truth in Lending Act's minimum award of $100 each for some 130,000 class members would be an 'horrendous, possibly annihilating punishment, unrelated to any damage to the purported class or to any benefit to defendant'." *Forman,* 164 F.R.D. at 405.[2] Nothing in either the *Forman* or the *Ratner* decisions supports Huntington's contention that the statutory damages provision of the TCPA violates due process.

Kenro, not surprisingly, takes issue with Huntington's very low estimate of the damages caused by violations of the TCPA. Huntington has submitted no evidence to support it's contention that the transmission of unsolicited fax advertisements imposes a cost of as little as two cents on the recipient.[3] Even if, as Huntington contends, the fax paper on which these unsolicited fax advertisements is printed costs no more than two cents per sheet, Congress was concerned with more than the cost of fax paper when it established the $500 statutory damages remedy. Congress designed a remedy that would take into account the difficult to quantify business interruption costs imposed upon recipients of unsolicited fax advertisements, effectively deter the unscrupulous practice of shifting these costs to unwitting recipients of "junk faxes", and "provide adequate incentive for an individual plaintiff to bring suit on his own behalf." *Forman,* 164 F.R.D. at 404. It is permissible for Congress to design a remedy that will "serve to liquidate uncertain actual damages and to encourage victims to bring suit to redress violations." *Mourning v. Family Publications Service, Inc.,* 411 U.S. 356, 376, 93 S.Ct. 1652, 1664, 36 L.Ed.2d 318 (1973) (upholding Truth in Lending Act provision for § 100—$1000 statutorily-prescribed damages).

Furthermore, in mathematical terms, a $500 penalty for violation of the TCPA is not so high in relation to actual damages as to violate the Due Process clause. In *Williams,* the Supreme court upheld a provision of an Arkansas statute providing that any railroad company that charges passengers more than the statutorily prescribed rate is subject to a penalty of "not less than fifty dollars nor more than three hundred dollars and costs of suit, including a reasonable attorney's fee," even though the overcharge in that particular case was only 66 cents. *Williams,* 251 U.S. at 64, 40 S.Ct. at 72. The Supreme Court explained:

> When the penalty is contrasted with the overcharge possible in any instance it of course seems large, but, as we have said, its validity is not to be tested in that way. When it is considered with due regard for the interests of the public, the numberless opportunities for committing the offense, and the need for securing uniform adherence to established passenger rates, we think it properly cannot be said to be so severe and oppressive as to be wholly dis-

---

**2.** The *Ratner* court's conclusion that the availability of individual TILA actions for $100 made the use of the class action improper because of the potential for "horrendous, possibly annihilating punishment" has been rejected in the Seventh Circuit. *See Haynes v. Logan Furniture Mart, Inc.,* 503 F.2d 1161, 1164 (7th Cir.1974); *Eovaldi v. First National Bank of Chicago,* 57 F.R.D. 545, 547 (N.D.Ill.1972) (potential for "horrendous" punishment not a valid consideration in evaluating petition for class certification under Fed.R.Civ.P. 23).

**3.** In fact, legislative history of the TCPA reveals that Congress was concerned that the transmission of unsolicited fax advertisement imposed upon the recipient "both the cost associated with the use of the facsimile machine and, the cost of the *expensive paper* used to print out facsimile messages." H.R.Rep. No. 317, 102d Cong., 1st Sess. 25 (1991) ("H.R.Rep. No. 317") (emphasis added).

proportioned to the offense or obviously unreasonable.

*Id.,* 251 U.S. at 67, 40 S.Ct. at 73; *see also, Scofield,* 751 F.Supp. at 1521 (upholding statutory damages of $100—$1,000, even without a showing of actual damages). Likewise, we conclude that even if the actual monetary costs imposed by advertisers upon the recipients of unsolicited fax advertisements is small when compared to the § 500 minimum penalty for such conduct, that penalty is not so "severe and oppressive" as to run afoul of the Due Process clause.

For the reasons discussed above, we find that § 227(b)(3)(B), which provides for a minimum penalty of § 500 for each violation of the TCPA, does not violate the Due Process clause of the Fifth Amendment. Accordingly, to the extent Huntington's motion to dismiss is premised upon its argument that § 227(b)(3)(B) is unconstitutional, the motion is **denied.**

*2. First Amendment Challenge*

 Huntington contends that § 227(b)(1)(C) violates the right of commercial free speech guaranteed by the First Amendment. In determining whether a statute regulating commercial speech violates the First Amendment, we apply the test formulated in *Central Hudson Gas & Elec. Corp. v. Public Service Commission of New York,* 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980). Under the *Central Hudson,* test, a statute regulating commercial speech is valid if (1) it is supported by a substantial governmental interest; (2) directly advances the government interest asserted; and (3) it is not more extensive than necessary to serve that interest. *Central Hudson,* 447 U.S. at 566, 100 S.Ct. at 2351. The Supreme Court has since explained the final two prongs of the *Central Hudson* test as requiring that there be a " 'reasonable fit' between the legislature's ends and the means chosen to accomplish those ends." *Board of Trustees of State University of New York v. Fox,* 492 U.S. 469, 480, 109 S.Ct. 3028, 3035, 106 L.Ed.2d 388 (1989); *City of Cincinnati v. Discovery Network Inc.,* 507 U.S. 410, 416, 113 S.Ct. 1505, 1510, 123 L.Ed.2d 99 (1993).

In the only federal court decision to date addressing the constitutionality of the TCPA's ban on transmission of unsolicited fax advertisements, the Ninth Circuit upheld § 227(b)(1)(C), finding that it met the *Central Hudson* test for restrictions on commercial speech. *Destination Ventures, Ltd. v. Federal Communications Commission,* 46 F.3d 54, 57 (9th Cir.1995). Huntington does not contest the government's substantial interest in preventing advertisers from unfairly shifting advertising costs to consumers and "return[ing] a measure of control to ... owners of facsimile machines." H.R.Rep. No. 317., at 6.[4] Rather, Huntington argues that § 227(b)(1)(a) of the TCPA, which bans the transmission of unsolicited fax advertising, is not narrowly tailored to achieve Congress' purpose.

*Destination Ventures* held that because "unsolicited commercial fax solicitations are responsible for the bulk of advertising cost shifting ... banning them is a reasonable means to achieve Congress' goal of reducing cost shifting." *Destination Ventures,* 46 F.3d at 56. Huntington asserts that *Destination Ventures* was poorly reasoned, and argues that the TCPA's ban on unsolicited fax advertisements is "an unqualified prohibition" upon the use of fax machines to disseminate commercial speech, (Huntington Reply, at 8) which is not narrowly tailored to achieve Congress' goals. Specifically, Huntington suggests that the TCPA could have been more narrowly tailored in several ways, including limiting distribution of fax advertising to non-business hours, requiring fax advertisers to reimburse recipients for any costs imposed upon them by unsolicited fax advertisements, requiring advertisers to maintain "do not fax" lists; or limiting the

---

**4.** The District Court in *Destination Ventures* held that:

> Congress' interest in protecting consumers from the economic harm resulting from the 'unfair shifting of the cost of advertising from the advertiser to the unwitting customer' and other harms that could be associated with un-

solicited fax solicitations (unsolicited faxes can interfere with a machine's use) is a substantial interest which is identified in the TCPA's legislative history.

*Destination Ventures,* 844 F.Supp. 632, 637 (D.Or.1994)

volume or frequency of fax advertising transmissions. (*Id.*)

A properly tailored restriction "focuses on the source of the evils the [government] seeks to eliminate ... and eliminates them without at the same time banning or significantly restricting a substantial quantity of speech that does not create the same evils." *Ward v. Rock Against Racism*, 491 U.S. 781, 799 n. 7, 109 S.Ct. 2746, 2758 n. 7, 105 L.Ed.2d 661 (1989). Contrary to Huntington's assertion, § 227(b)(1)(C) is not an "unqualified prohibition" on the transmission of commercial speech via fax machine; advertisers are only prohibited from using fax machines to transmit advertising material to other fax machines when the recipient has neither invited nor given permission for such transmission. *See* 47 U.S.C. § 227(a)(4) (defining "unsolicited advertisement"). We agree with the *Destination Ventures* court's conclusion that the TCPA's ban on unsolicited transmissions of fax advertisements both directly advances Congress' asserted interests and is narrowly tailored to those interests. The Supreme Court's decisions in *Discovery Network* and *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. ——, 116 S.Ct. 1495, 134 L.Ed.2d 711 (1996), do not, as Huntington asserts, require us to strike down the TCPA's ban on unsolicited fax advertisements. *Discovery Network* struck down an ordinance prohibiting distribution of "commercial publications through freestanding news racks located on public property." The Supreme Court held that the ordinance's selective ban of commercial news racks bore no relationship whatsoever to the asserted interest in safety and aesthetics, since commercial newsracks "are not greater an eyesore" and no greater a safety hazard than the more numerous newspaper newsracks not banned by the ordinance. *Discovery Network*, 507 U.S. at 425–26, 113 S.Ct. at 1514–15. *Liquormart* involved a statute that completely banned all advertisement of liquor prices outside the store. The Supreme Court held that

such a ban was totally unrelated to the state's asserted interest in keeping liquor prices at a certain level in order to promote temperance. *Liquormart*, 517 U.S. at ——, 116 S.Ct. at 1509–10. In contrast to the statutes struck down in *Discovery Network* and *Liquormart* the TCPA's ban on unsolicited fax advertisements directly relates to the government's substantial interest in protecting consumers from the intrusion upon the use of their own fax machines and from the shifting of advertising costs.

Similarly, Huntington's comparison of unsolicited fax advertisements to mail, television and newspaper advertisements is unavailing for the simple reason that the latter forms of advertising impose no costs on unwilling consumers. Television and newspaper ads are never "unsolicited," since television viewers and newspaper readers must voluntarily turn on the television or read the newspaper in order to "receive" the advertisements, and a recipient of direct mail advertising, unlike recipients of unsolicited fax advertisements, is not forced to assume any of the costs of producing those advertisements, nor does the use of his mailbox impose potentially interfere with receipt of legitimate business mail.[5]

█ Furthermore, the mere existence of "some imaginable alternative that might be less burdensome on speech" does not mean that the restriction is not narrowly tailored for purposes of First Amendment analysis. *Ward*, 491 U.S. at 797, 109 S.Ct. at 2757. The requirement that a regulation be narrowly tailored to the government's asserted substantial interest does not mean that the regulation employ the "least restrictive means" available. *Fox*, 492 U.S. at 480, 109 S.Ct. at 3035; *Discovery Network*, 507 U.S. at 416, n. 12, 113 S.Ct. at 1510, n. 12. The plaintiffs in *Destination Ventures* suggested the same alternatives to the TCPA's ban on unsolicited fax advertising that Huntington now suggests: "creating and maintaining a 'do not fax' list; regulating the hours of fax

---

5. Legislative history of the TCPA reveals that Congress anticipated comparisons to direct mail advertising, and specifically found that "when an advertiser sends marketing material to a potential customer through regular mail, the recipient pays nothing to receive the letter. In the case of

fax advertisements, however, the recipient assumes both the cost associated with the use of the facsimile machine and, the cost of the expensive paper used to print out facsimile messages." H.R.Rep. No. 317, at 25.

advertising; limiting the number or frequency of transmissions". *Destination Ventures,* 844 F.Supp. at 639. We agree with the District Court's conclusion in *Destination Ventures* that these suggested alternatives "fail to establish that the legislation Congress did choose is improperly tailored for its targeted goal." *Id.*

For the reasons discussed above, we find that the ban on unsolicited fax advertisements set forth at § 227(b)(1)(C) of the TCPA is narrowly tailored to the government's asserted interest in protecting consumers from the unfair shifting of advertising costs and from interruption of their use of their own fax machines, and therefore does not violate the First Amendment guarantee of commercial free speech. Accordingly, Huntington's motion to dismiss Kenro's complaint on the grounds that 227(b)(1)(C) is unconstitutional is **denied.**

## C. *Kenro's Petition for Class Certification.*

 Kenro petitions for certification of a plaintiff class composed of

all persons or entities who have received and/or are currently receiving a publication from Fax Daily, Inc. via telephone facsimile machine containing any material advertising the commercial availability or quality of any property, goods, or services without the prior expressed invitation of permission of such person or entity.

(Petition for Class Certification, at 1).

Under Fed.R Civ.P. 23(a), a plaintiff may act as representative of a class only if:

(1) the class is so numerous that joinder of all members is impracticable ("numerosity"), (2) there are questions of law or fact common to the class ("commonality"), (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class ("typicality"), and (4) the representative parties will fairly and adequately protect the interests of the class ("adequacy of representation").

If a plaintiff satisfies all the requirements of Rule 23(a), he must then satisfy at least one of the subparagraphs in Rule 23(b). Fed.R.Civ.P. 23. Kenro seeks certification under Rule 23(b)(3), which requires that "questions of law or fact common to the members of the class predominate over any questions affecting only individual members, [and that] a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed.R Civ.P. 23(b)(3).

In *Forman, supra* the District Court for the Eastern District of Pennsylvania denied certification of a class nearly identical to Kenro's proposed class, defined in that case as all residents and businesses who have received unsolicited facsimile advertisements since [December 20, 1992]. The *Forman* court held that the proposed class definition failed to satisfy the commonality and typicality requirements because each potential plaintiff, in order to qualify as a member of the plaintiff class, would have to prove "whether a specific transmission to its machine was without express invitation or permission on its part." *Forman,* 164 F.R.D. at 404. Therefore, the court held that the "proposed class definition flies directly in the face of a basic tenet of class certification: a court may not inquire into the merits of the case at the class certification stage." *Forman,* 164 F.R.D. at 403, *citing Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 177–78, 94 S.Ct. 2140, 2152–53, 40 L.Ed.2d 732 (1974).

As in *Forman* the definition of Kenro's proposed plaintiff class would require the court to address the central issue of liability; in fact, Kenro has simply incorporated the language of the statutory prohibition into its class definition. Because Kenro's class definition would require the court to conduct individual inquiries with regard to each potential class member in order to determine whether each potential class member had invited or given permission for transmission of the challenged fax advertisements, Kenro has failed to meet the requirements of Rule 23(a). *Id.*[6]

---

**6.** For the same reasons that Kenro has failed to meet the commonality and typicality requirements of Rule 23(a), Kenro's assertion that

questions of law and fact common to the class predominate over any questions affecting only

For the reasons discussed above, we find that Kenro's proposed class definition fails to meet the requirements of Rules 23(a) and (b), and would impermissibly require this Court to conduct individual inquiries into the merits of each potential plaintiffs case in order to determine their qualifications as class members. Accordingly, Kenro's petition for class certification is denied.

### D. Fax Daily's Motion to Dismiss for Failure to State a Claim.

In assessing the propriety of a motion to dismiss for failure to state a claim upon which relief can be granted pursuant to Rule 12(b)(6), this Court must accept as true all well-pleaded factual allegations in the complaint and must draw all reasonable inferences in favor of the plaintiffs. *Palda v. General Dynamics Corp.,* 47 F.3d 872, 874 (7th Cir.1995), *reh'g denied.* We may grant a 12(b)(6) motion only if "it is beyond doubt that the non-movant can plead no facts that would support his claim for relief." *Id.* (quoting *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957)).

■ Fax Daily asserts that Kenro has failed to state a claim under the TCPA because the TCPA does not apply to the Fax Daily publication, which it characterizes as a "Newsletter Publication of opinionated reader-provided editorial" which happens to also contain advertisements "incidental" to it's editorial content. (See Fax Daily's Memo. in Support of Motion to Dismiss, at 1).[7]

■ We agree with Fax Daily that Congress' primary purpose in enacting the ban on unsolicited fax transmissions was to prevent the shifting of advertising costs to recipients of unsolicited fax advertisements, and that the TCPA, by its terms, applies only to fax advertisements, as opposed to other forms of communication transmitted by fax (See, Section B(2) above). However, we do not agree that the Fax Daily publication, because it contains some "editorial" material in addition to advertisements, is therefore not an "advertisement" subject to the TCPA's ban on unsolicited fax advertisements.[8]

The TCPA defines "unsolicited advertisement" as "any material advertising the commercial availability or quality of any property, goods, or services which is transmitted to any person without that person's prior express invitation or permission." 47 U.S.C. § 227(a)(4). Neither the text of the Act nor its legislative history gives any indication that Congress intended the prohibition to cover only material that is one-hundred percent advertising material; nor is there any guidance with regard to where to draw the line between "advertisements" and other types of publications, when the publication in question contains both advertising material and news, editorial or other items.

The Supreme Court did, however, address a nearly identical issue in several cases which arose before commercial speech was granted First Amendment protection.[9] In *Valentine*

individual members, pursuant to Rule 23(b)(3), is incorrect.

7. In addition to its claim that the TCPA does not apply to the Fax Daily publication, Fax Daily also asserts that it has taken many measures, including asking recipients their preference with regard to the time of day they receive Fax Daily, offering free fax paper to recipients, offering recipients the option to cancel at any time, maintaining a "do not call" list and training its personnel in using the "do not *call*" system, in an effort to address the concerns expressed by Congress in enacting the TCPA. Such efforts probably are commendable (we say that without implying any views on the merits), and we do not doubt that Fax Daily has perhaps been successful to some extent in limiting transmission of its publication to those who wish to receive it. However, that does not mean that those persons who do receive unsolicited transmissions of the

Fax Daily publication cannot bring an action under the TCPA.

8. Fax Daily claims that certain unnamed FCC attorneys expressed to Fax Daily their "personal opinions" that the TCPA does not apply to "bona fide publications" such as the Fax Daily. (Fax Daily Memo., at 6–7). (Fax Daily did not number the pages of its Memorandum; the Court has assigned page numbers for the purposes of citation to Fax Daily's Memorandum.) Fax Daily has provided absolutely no documentation of these alleged conversations; but such documentation would be of no help to Fax Daily because the "personal opinions" of FCC attorneys, besides being irrelevant, are not binding on this Court.

9. In *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council Inc.,* 425 U.S. 748, 96

*v. Chrestensen,* 316 U.S. 52, 62 S.Ct. 920, 86 L.Ed. 1262 (1942),[10] the Court addressed the applicability of a statute prohibiting distribution in the streets of "commercial and business advertising matter" to a person who distributed a handbill which contained commercial advertisements on one side and a political protest on the other. The distributor of the handbill in *Chrestensen* argued, as does *Fax Daily* that the legitimate character of his political speech was not diminished by the presence of advertisements. 316 U.S. at 55, 62 S.Ct. at 921. The Supreme Court found that the facts of that case justified the conclusion that the affixing of political material to the handbill was for the purpose of evading the ordinance, and held that the handbill was subject to the prohibition on distribution of commercial advertising material. In so holding, the Court noted:

if that evasion were successful, every merchant who desires to broadcast advertising leaflets in the streets need only append a civil appeal, or a moral platitude, to achieve immunity from the law's command.

*Id.* at 55, 62 S.Ct. at 922.

The following year, the Supreme Court reviewed a state prohibition of the distribution of handbills as applied to a religious handbill which contained on one side, an invitation to a Jehovah's Witness gathering, and on the other side, the same invitation along with a description of two books about the Jehovah's Witness religion and the statement "Postage Prepaid on your contribution of 25¢." *Jamison v. Texas,* 318 U.S. 413, 414, 63 S.Ct. 669, 671, 87 L.Ed. 869 (1943). The Court held that the Jehovah's Witness handbills were not unprotected commercial speech "merely because the handbills invite the purchase of books for the improved understanding of the religion or ... seek in a lawful fashion to promote the raising of funds for religious purposes." *Id.* at 417, 63 S.Ct. at

672; *see also Murdock v. Pennsylvania,* 319 U.S. 105, 63 S.Ct. 870, 87 L.Ed. 1292 (1943) (distribution of Jehovah's Witness literature not a commercial activity simply because the literature is offered for commercial sale); *Village of Schaumburg v. Citizens for a Better Environment,* 444 U.S. 620, 100 S.Ct. 826, 63 L.Ed.2d 73 (1980) (recognizing that solicitation of funds is often "intertwined with informative and perhaps persuasive speech seeking support for particular causes or for particular views on economic, political, or social issues ...").

We believe that the Fax Daily publication is more like the handbill in *Chrestensen* than those in *Jamison* or *Murdok.* The July 11, 1995, and July 13, 1995 editions, which are attached to Kenro's complaint as "Exhibit A," contain approximately 30 to 50 percent advertising, the substance of which is completely unrelated to the jokes, editorial letters, and other material contained in the publication. In addition, two pages of a three-page edition which was apparently transmitted on July 8, 1995, consist entirely of coupons and "classified" advertisements. (See Complaint, Exhibit A). Furthermore, each edition of Fax Daily included in Exhibit A to Kenro's Complaint encourages readers to advertise in the Fax Daily and to "take advantage of [the merchants'] money-saving offers." (Exhibit A). Keeping in mind that, in resolving Fax Daily's motion to dismiss, we must draw all reasonable inferences in favor of Kenro, we conclude that the allegations of the complaint could reasonably support a conclusion that the Fax Daily publication is, itself an advertisement for its own advertising services, or at least that its primary function is advertising, and that the unrelated editorial content is included for the purpose of evading the prohibitions of the TCPA. An interpretation of the TCPA that excludes from its coverage any publication

S.Ct. 1817, 48 L.Ed.2d 346 (1976), the Supreme Court held that commercial speech was entitled to some First Amendment protection, albeit lesser protection than that accorded non-commercial speech. *See also Fox,* 492 U.S. at 477, 109 S.Ct. at 3033; *Central Hudson,* 447 U.S. at 563, 100 S.Ct. at 2350. Prior to the Court's decision in *Virginia State Bd. of Pharmacy,* commercial speech was not accorded First Amendment protection.

10. *Chrestensen* was overruled by *Virginia State Bd. of Pharmacy* insofar as *Chrestensen* held that commercial speech was unprotected by the First Amendment. We believe, however, that the logic of the Supreme Court's holding with regard to the commercial character of the handbill at issue in that case is persuasive.

that is not one-hundred percent advertising material would effectively render the Act's prohibition of unsolicited fax advertisements meaningless, for such an interpretation would allow advertisers to evade the TCPA simply by including items such as jokes, quotes from Shakespeare, or movie reviews, along with their advertisements. *See Chrestensen,* 316 U.S. at 55, 62 S.Ct. at 922.

For the reasons discussed above, we find that the allegations of the complaint support a conclusion that the Fax Daily publication is an "advertisement" subject to the TCPA's ban on unsolicited fax advertisements. Accordingly, Fax Daily's motion to dismiss is **denied.**

### III. CONCLUSION

For the reasons discussed above, the Court finds as follows:

1) The Court stands by its decision in *Kenro v. Fax Daily, Inc.,* 904 F.Supp. 912 (S.D.Ind.1995), holding that the TCPA authorizes concurrent federal and state jurisdiction over actions brought under the TCPA. Kenro's request that we reconsider that decision in light of the Fourth Circuit's decision to the contrary in *International Science* is **denied.**

2) The Court finds that the provision of the TCPA prohibiting the use of a fax machine to send an unsolicited advertisement to another fax machine, 47 U.S.C. § 227(b)(1)(C), does not violate the First Amendment's guarantee of commercial free speech, and that the provision for minimum damages of $500 for violations of the prohibition on unsolicited fax advertisements, 47 U.S.C. § 227(b)(3)(B), does not violate the Due Process Clause of the Fifth Amendment. Accordingly, Huntington's Motion to Dismiss Kenro's Complaint is **denied.**

3) The Court finds that Kenro's proposed class definition fails to satisfy the requirements of Fed.R.Civ.P. 23, and that it would require the Court to conduct a factual inquiry into the merits of each potential class member's claim. Ac-

cordingly, Kenro's petition for class certification is **denied.**

4) The Court finds that the allegations of Kenro's complaint support a conclusion that the Fax Daily publication is an "advertisement" subject to the TCPA's ban on unsolicited fax advertisements. Accordingly, Fax Daily's Motion to Dismiss for failure to state a claim is **denied.**