# United States Court of Appeals

**FOR THE EIGHTH CIRCUIT**

_____

Nos. 02-2705/2707

_____

| | | |
|---|---|---|
| State of Missouri, ex rel. Jeremiah W. (Jay) Nixon, Attorney General, | * * * | |
| Plaintiff-Appellant, | * * | |
| United States of America, | * * | |
| Intervenor/Plaintiff-Appellant, | * * * | |
| v. | * * | |
| American Blast Fax, Inc., a Texas corporation not authorized to transact business in Missouri as a foreign corporation, | * * * * * | Appeal from the United States District Court for the Eastern District of Missouri. |
| Defendant-Appellee, | * * | |
| Fax.com, Inc. | * * | |
| Movant-Appellee. | * * * * | |
| _____ | * * | |
| State of California; State of Alaska; State of Arkansas; State of Connecticut; State of Colorado; District of Columbia; State of Florida; State of Idaho; State of Illinois; State of Iowa; State of Kentucky; State of Maryland; State of Michigan; State of Minnesota; State of | * * * * * * * | |

New Mexico; State of Oregon, State of    *
South Dakota; State of Texas; State of    *
Vermont; State of West Virginia,    *
                                          *
        Amici Curiae on behalf    *
        of Appellants,    *
                                          *
American Business Media; Wal-Mart    *
Stores, Inc.; ACS Systems,    *
Incorporated; Micro General    *
Corporation,    *
                                          *
        Amici Curiae on behalf    *
        of Appellees.    *

_____

Submitted: January 13, 2003
Filed: March 21, 2003
_____

Before WOLLMAN and MURPHY, Circuit Judges, and GRITZNER,[1] District Judge.
_____

MURPHY, Circuit Judge.


In these two consolidated cases the State of Missouri sued American Blast Fax, Inc. and Fax.com, Inc. for violating statutory restrictions on unsolicited fax advertising. The district court held that the relevant part of the Telephone Consumer Protection Act of 1991 (TCPA), 47 U.S.C. § 227(b)(1)(C) (2000), violated the First Amendment guarantee of freedom of speech, and dismissed the action.[2] Missouri ex

_____

[1]The Honorable James E. Gritzner, United States District Judge for the Southern District of Iowa, sitting by designation.

[2]The district court also dismissed other allegations in the complaints. Also dismissed were alleged statutory violations for omitting information required by

-2-

rel. Nixon v. Am. Blast Fax, Inc., 196 F. Supp. 2d 920, 934 (E.D. Mo. 2002). Intervenor United States and Missouri appeal (collectively "the Government"). We reverse.

I.

American Blast Fax[3] and Fax.com (FC) provide promotional services by transmitting client advertisements to the fax machines of potential customers. In response to numerous consumer complaints, Missouri sought injunctions and civil penalties against the two companies, alleging that they had violated the provision of TCPA making it unlawful "to send an unsolicited advertisement to a telephone facsimile machine." 47 U.S.C. § 227(b)(1)(C). An "unsolicited advertisement" is defined in the statute as "any material advertising the commercial availability or quality of any property, goods, or services which is transmitted to any person without that person's prior express invitation or permission." Id. § 227(a)(4).

The fax companies moved to dismiss the complaints, arguing that § 227(b)(1)(C) was an unconstitutional restriction on their freedom of speech. The district court decided that the legislative record was insufficient to decide the constitutional questions and ordered an evidentiary hearing, converting the motions to ones for summary judgment. It also granted the motion of the United States to intervene.

---

TCPA sec. 3, § 227(d), 47 U.S.C. § 227(d), and for misrepresenting that advertisements complied with federal law in violation of the Missouri Merchandising Practices Act, Mo. Rev. Stat. § 407.010. No issue has been raised on appeal about these dismissed claims. See Halabi v. Ashcroft, 316 F.3d 807, 808 (8th Cir. 2003) (objection waived if not briefed).

[3]American Blast Fax has not participated in this appeal and may no longer be in business. See Missouri ex rel. Nixon v. American Blast Fax, Inc., 196 F. Supp. 2d 920, 922 n.3, 923 n.4 (E.D. Mo. 2002).

At the hearing, the Government presented evidence that unsolicited fax advertising shifts costs to the recipients who are forced to contribute ink, paper, wear on their fax machines, as well as personnel time. There was also evidence to show that a fax advertisement interferes with the recipients' use of their machines by preempting the fax line for the time it takes to send a message. Witnesses testified on behalf of the attorneys general of Florida and Washington that their offices had been receiving increasing numbers of complaints about unsolicited fax advertisements. The defendant companies presented evidence that technological advances had reduced the amount of costs and interference experienced by recipients and that fax advertising benefits both advertisers and consumers.

The district court approached the constitutional questions by applying the four part test for restrictions on commercial speech under Central Hudson Gas & Electric Corp. v. Public Service Commission, 447 U.S. 557, 566 (1980). The court questioned whether the government had shown that there was a substantial governmental interest in restricting unsolicited fax advertising. It noted the absence of empirical data on costs or evidence that the majority of unsolicited fax advertisements involved commercial speech. It also observed that complaints about unsolicited faxes had increased despite the legislation and that several less restrictive options were available, such as a national no fax database, and it concluded that the Government had not demonstrated that the § 227(b)(1)(C) restriction would materially alleviate the asserted harm or that it was sufficiently narrow. After concluding that § 227(b)(1)(C) violated the First Amendment, the district court granted the pending motions and dismissed the action.

The United States and Missouri appeal. They argue that the statute is constitutional and that the district court erred in its application of the Central Hudson test. They contend that there was sufficient evidence to demonstrate a substantial government interest in restricting unsolicited fax advertisements and that TCPA materially advanced that interest and was not more extensive than necessary. They

argue that technological changes have not eliminated the burdens imposed on recipients of unwanted fax advertising and that the district court was wrong to substitute its own judgment for the conclusion of Congress that the restriction was the minimum necessary to protect the public. They also point out that no other federal court has found this statute unconstitutional. See Destination Ventures, Ltd. v. FCC, 46 F.3d 54, 57 (9th Cir. 1995), *aff'g* 844 F. Supp. 632 (D. Or. 1994); Texas v. Am. Blast Fax, Inc., 121 F. Supp. 2d 1085, 1092 (W.D. Tex. 2000); Kenro, Inc. v. Fax Daily, Inc., 962 F. Supp. 1162, 1169 (S.D. Ind. 1997).

II.

The parties agree that the fax advertisements in question are commercial speech, and the Supreme Court has recently indicated that Central Hudson remains the test for the constitutionality of a restriction on commercial speech. See Thompson v. W. States Med. Ctr., 122 S. Ct. 1497, 1504 (2002). Under Central Hudson

> we ask as a threshold matter whether the commercial speech concerns unlawful activity or is misleading. If so, then the speech is not protected by the First Amendment. If the speech concerns lawful activity and is not misleading, however, we next ask "whether the asserted governmental interest is substantial." If it is, then we "determine whether the regulation directly advances the governmental interest asserted," and, finally, "whether it is not more extensive than is necessary to serve that interest." Each of these latter three inquiries must be answered in the affirmative for the regulation to be found constitutional.

Id. (citations omitted) (quoting Central Hudson, 447 U.S. at 566). Since it is not argued here that the faxes were misleading or concerned unlawful activity, only the final three elements of the Central Hudson test are at issue. We review an order granting summary judgment de novo. Donovan v. Harrah's Md. Heights Corp., 289 F.3d 527, 528 (8th Cir. 2002).

## A.

FC argues that the Government has not shown a substantial governmental interest. It contends that the asserted interest, preventing unwanted fax advertising from shifting advertising costs to unwilling consumers and interfering with their fax machines, is insufficient to justify the statutory restriction. It contends that the Government has not produced empirical data to support its assertion and that technological progress has reduced any harm to a de minimis level. See Edenfield v. Fane, 507 U.S. 761, 771 (1993) (government "must demonstrate that the harms it recites are real").

We do not agree with FC that the Government must produce empirical studies to show the significance of the harm it seeks to remedy, for the Supreme Court has pointed out that it may demonstrate the substantiality of its interest with anecdotes, "history, consensus, and 'simple common sense.'" Florida Bar v. Went For It, Inc., 515 U.S. 618, 628 (1995) (quoting Burson v. Freeman, 504 U.S. 191, 211 (1992)); cf. Van Bergen v. Minnesota, 59 F.3d 1541, 1554 (8th Cir. 1995) ("external evidence" of harm unnecessary in case involving content neutral speech restriction). In this case, the legislative record and the evidence produced in the district court adequately demonstrate the potential harm of unrestrained fax advertising.

We first turn to the legislative history, which predates the passage of TCPA. A hearing on predecessor bills showed that Congress had become aware of a "junk fax" problem from media reports and legislative initiatives in many states. Telemarketing Practices: Hearing on H.R. 628, H.R. 2131, and H.R. 2184 Before the Subcomm. on Telecomm. and Fin. of the House Comm. on Energy and Commerce, 101st Cong. 2–3 (1989) (statements of Chair Markey and Rep. Rinaldo, Subcomm. on Telecomm. and Fin. of the House Comm. on Energy and Commerce). A Maryland official testified that even though his state had passed a measure to ban unsolicited commercial fax advertisements, federal legislation was required for a full solution to

-6-

a problem likely "to grow in scale." Id. at 82–83 (statement of John M. Glynn, Maryland Office of People's Counsel). The subcommittee was also presented with research which indicated the pervasive nature of this type of advertising. It was reported that at least one fax advertiser could "routinely send[] 60,000 fax advertisements per week" and that "business owners are virtually unanimous in their view that they do not want their fax lines tied up by advertisers trying to send messages." Id. at 54–56 (footnote omitted) (statement of Robert L. Ellis, Indiana University School of Law).

In hearings held in 1991, the cofounder of the Center for the Study of Commercialism described the "numerous nuisance faxes" he had received and complained that they "not only use the recipient's paper, but also prevent faxes from being sent out and prevent legitimate faxes from coming in." Hearing on S. 1462, S. 1410, and S. 857 Before the Subcomm. on Communications of the Senate Comm. on Commerce, Sci., and Transp., 102d Cong. 41 (1991) (statement of Michael Jacobson). A House subcommittee heard from the chair of the Florida Public Service Commission that "[t]he junk fax advertiser is a nuisance who wants to print [its] add [sic] on your paper . . . [and] seizes your fax machine so that it is not available for calls you want or need." Telemarketing/Privacy Issues: Hearing on H.R. 1304 and H.R. 1305 Before the Subcomm. on Telecomm. and Fin. of the House Comm. on Energy and Commerce, 102d Cong. 31 (1991) (statement of Thomas Beard). TCPA was subsequently enacted in that same year.

The hearing held in the district court in 2001 also produced evidence that the harms of unsolicited fax advertising are real and have not been eliminated by technological changes. There was evidence that unsolicited fax advertisements can shift to the recipient more than one hundred dollars per year in direct costs, that it takes thirty seconds for a one page fax to be received, that most machines can still only receive one fax at a time, that currently eighty percent of all faxes are printed on paper, and that unsolicited fax advertising interferes with company switchboard

operations and burdens the computer networks of those recipients who route incoming faxes into their electronic mail systems. The record evidence from that hearing indicates that the costs and amount of interference resulting from unrestrained fax advertising continue to be significant. See Destination Ventures, 46 F.3d at 57 ("[U]nsolicited fax advertisements shift significant advertising costs to consumers.").

We conclude that the Government has demonstrated a substantial interest in restricting unsolicited fax advertisements in order to prevent the cost shifting and interference such unwanted advertising places on the recipient.

B.

FC contends that there are several reasons why the TCPA restriction on commercial faxes cannot survive the third part of the Central Hudson test, which requires a showing that "'the regulation directly advances the governmental interest asserted.'" W. States, 122 S. Ct. at 1504 (quoting Central Hudson, 447 U.S. at 566); see also Rubin v. Coors Brewing Co., 514 U.S. 476, 487 (1995) ("Government carries the burden of showing that the challenged regulation advances the Government's interest in a direct and material way." (internal quotation marks omitted)). This step helps ensure that there is "a reasonable fit between the legislature's ends and the means chosen to accomplish [them]." Lorillard Tobacco Co. v. Reilly, 533 U.S. 525, 556 (2001) (internal quotations marks omitted).

1.

FC argues that if a restriction treats commercial and noncommercial speech differently, there must be a basis for the difference that is relevant to the asserted governmental interest. FC contends that this case is just like City of Cincinnati v. Discovery Network, Inc. where an ordinance was found unconstitutional because there was not a good fit between the asserted aesthetic interest and the ban on only

commercial newsracks on the street. <u>See</u> 507 U.S. 410, 425, 428 (1993). FC argues that a noncommercial fax shifts costs and interferes with a recipient's fax machine just as much as a commercial fax.

This case is different from <u>Discovery Network</u>, however, because the distinction between commercial and noncommercial faxes is relevant to the asserted governmental interest. In <u>Discovery Network</u> the only justification advanced by the city for singling out commercial newsracks was "the 'low value' of commercial speech," a position which the court refused to adopt. 507 U.S. at 428. When Congress enacted TCPA, however, it had found that "non-commercial calls . . . are less intrusive to consumers because they are more expected." H.R. Rep. No. 102-317, at 16 (1991). There is no reason to doubt that Congress also believed for the same reason that noncommercial faxes did not present the same problem as commercial faxes and therefore distinguished between them. The Supreme Court has indicated that Congress may rely on various forms of evidence to distinguish between different types of speech. <u>See</u> <u>Florida Bar</u>, 515 U.S. at 628. For example, restrictions on speech may be justified "by reference to studies and anecdotes pertaining to different locales altogether . . . [and] history, consensus, and 'simple common sense.'" <u>Id.</u> (quoting <u>Freeman</u>, 504 U.S. at 211). The legislative history here shows that TCPA's distinction between commercial and noncommercial fax advertising is relevant to the goal of reducing the costs and interference associated with *unwanted* faxes. We agree with the Ninth Circuit that this distinction is justified.[4] <u>Destination Ventures</u>, 46 F.3d at 56.

---

[4]<u>Discovery Network</u> also differs from this case in that commercial newsracks represented only a small percentage of the newsracks on Cincinnati streets, 507 U.S. at 418, while commercial faxes make up a large proportion of all unsolicited faxes, <u>see</u> <u>infra</u> p.13. Moreover, the government may regulate one aspect of a problem without regulating all others, <u>see</u> <u>United States v. Edge Broad. Co.</u>, 509 U.S. 418, 434 (1993) ("Government [is not required to] make progress on every front before it can make progress on any front.").

2.

FC also argues that the restriction on fax advertising cannot directly and materially advance the asserted governmental interest because gaps in the statute's coverage limit its effectiveness. Unsolicited live telemarketing calls, some types of unsolicited commercial faxes, and unsolicited noncommercial faxes are not restricted, and FC contends that TCPA thus resembles the statutes struck down in Coors, 514 U.S. at 488, and Greater New Orleans Broadcasting Association v. United States, 527 U.S. 173, 190 (1999).

TCPA is quite different from the statutes at issue in Coors and Greater New Orleans. In Coors, the government claimed that legislation prohibiting the display of alcohol content on beer labels advanced the legislative interest in "curbing 'strength wars' by beer brewers who might seek to compete for customers on the basis of alcohol content." 514 U.S. at 483. The Supreme Court found "overall irrationality" in the statute since it did not apply to advertisements, and alcohol content in a product could be widely disclosed by other means; such advertising would appear to be "a more influential weapon in any strength war than labels." Id. at 488. Moreover, the statutory restriction did not apply to wine, spirits, or the "term 'malt liquor.'" Id. at 488–89. The asserted governmental interest in suppressing competition based on high alcohol content was therefore unlikely to be advanced. Likewise, in Greater New Orleans the Court was skeptical about the government's position that legislation banning advertisements for private casino gambling served the governmental interests of "reducing the social costs associated with 'gambling'" and helping states restrict it. 527 U.S. at 185. The Court found the government's position inconsistent with its "simultaneous" support for tribal casino gambling which could involve the same social costs. Id. at 189–91. Inconsistencies and discrepancies in these two pieces of legislation therefore showed that the statutes were not likely to advance their asserted purposes. See id. at 190; Coors, 514 U.S. at 489.

-10-

TCPA by contrast contains no inconsistency that renders it incapable of materially advancing the Government's asserted interest. While there is differential treatment in TCPA of unsolicited fax advertisements and live telemarketing calls, the difference is consistent with TCPA's goal to protect members of the public from bearing the costs of unwanted advertising.[5] Thus, TCPA treats live telemarketing solicitations differently if they impose costs on the recipient. While they are generally permitted unless an individual has registered an objection to being contacted, see 47 U.S.C. § 227(c), 47 C.F.R. § 64.1200(e)(2)(iii) (2002), they are prohibited when they result in out of pocket costs for the recipient, see 47 U.S.C. § 227(b)(1)(A)(iii) (prohibiting calls made without consent "to any telephone number assigned to a paging service, cellular telephone service, specialized mobile radio service, or other radio common carrier service, or any service for which the called party is charged for the call"). Because of the cost shifting of fax advertising, it was consistent for Congress to treat unsolicited fax advertisements differently than live telemarketing calls. The distinction in no way undercuts the TCPA goal of protecting the public from unwanted advertising costs.

FC also argues that the legislation was made unconstitutionally inconsistent by a statutory interpretation of the Federal Communications Commission (FCC). The

---

[5]The distinction made in TCPA between live telemarketing calls and faxes is also consistent with other concerns behind the statutory scheme. Because Congress found telemarketing solicitations made by a person to be less of a nuisance or of an invasion of privacy than artificial or prerecorded calls, see S. Rep. No. 102-178, at 4 & n.4, 5 & n.5 (1991), reprinted in 1991 U.S.C.C.A.N. 1968, 1972–73, live solicitations are permitted unless an individual has registered an objection in advance, see 47 U.S.C. § 227(c), 47 C.F.R. § 64.1200(e)(2)(iii) (2002), while "artificial" calls are prohibited without the recipient's express consent, 47 U.S.C. § 227(b)(1)(B). Artificial or prerecorded messages, like a faxed advertisement, were believed to have heightened intrusiveness because they are unable to "interact with the customer except in preprogrammed ways." S. Rep. No. 102-178, at 4–5, reprinted in 1991 U.S.C.C.A.N. at 1972.

FCC has interpreted TCPA not to prohibit the sending of unsolicited commercial faxes to a recipient with whom a sender has an established business relationship. See In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, 7 F.C.C.R. 8752, 8779 n.87 (Oct. 16, 1992). Even if one assumes that this FCC interpretation is entitled to deference and is part of the governing law, it does not undermine the governmental interest in reducing the cost shifting and interference caused by unwanted commercial faxes. It would not have been unreasonable for Congress to conclude that a preexisting business relationship is an indication that a fax advertisement would be welcome. Congress in fact made this distinction explicit with respect to telephone solicitations. See 47 U.S.C. § 227(a)(3). We cannot conclude that this exemption renders the statute so "pierced by exemptions and inconsistencies," Greater New Orleans, 527 U.S. at 190, or "overall irrational[]," Coors, 514 U.S. at 488, that it cannot materially and directly advance the governmental interest.[6]

Finally, FC urges that TCPA's prohibition of only unsolicited commercial faxes prevents the statute from advancing the asserted governmental interest. The legislative record indicates that commercial calls constitute the bulk of all

---

[6]FC argues in addition that TCPA does not prohibit unsolicited commercial faxes regarding job openings and "image" advertisements not explicitly offering a product for sale. These are not exceptions contained in the statute, however. One was put forward by a federal district judge, see Lutz Appellate Servs., Inc. v. Curry, 859 F. Supp. 180, 181–82 (E.D. Pa. 1994) (faxed advertising of job openings do not fall within the scope of TCPA), and the other has been asserted by FC itself. Not only are these "exceptions" not in the statute, but they would not undermine the Government's asserted purpose, unlike the statutory exceptions in Coors, 514 U.S. at 489, and Greater New Orleans, 527 U.S. at 190. In contrast, TCPA directly and materially advances Congress's goal by squarely addressing the category of commercial fax advertising that appears to make up a substantial portion of all such faxes, i.e., those "advertising the commercial availability or quality of any property, goods, or services," 47 U.S.C. § 227(a)(4).

telemarketing calls, see H.R. Rep. No. 102-317, at 16, and in the absence of contrary evidence we are persuaded that commercial faxes likely constitute a similar proportion of all unsolicited faxes, cf. Florida Bar, 515 U.S. at 628 (restrictions on speech may be justified "by reference to studies and anecdotes pertaining to different locales altogether . . . [and] history, consensus, and 'simple common sense'" (quoting Freeman, 504 U.S. at 211)).  By placing restrictions on those responsible for a large portion of the problem, TCPA directly and materially advances the congressional goal of limiting the harm arising from unsolicited fax advertisements.  Congress is not required to "make progress on every front before it can make progress on any front." United States v. Edge Broad. Co., 509 U.S. 418, 432–34 (1993) (statute that effectively eliminated only small ratio of lottery advertisements still directly advanced a governmental interest of "discouraging public participation in lotteries"); see also Destination Ventures, 46 F.3d at 56 ("The First Amendment does not require Congress to forgo addressing the problem at all unless it completely eliminates cost shifting.").

We conclude that the TCPA's prohibition on unsolicited commercial fax advertisements directly and materially advances the asserted governmental interest and satisfies the third element of the Central Hudson test.

C.

The final question in the Central Hudson test is whether the restriction on speech is "'not more extensive than necessary to serve the interests that support it.'" Lorillard, 533 U.S. at 556 (quoting Greater New Orleans, 527 U.S. at 188).  FC argues that there are several alternative solutions to the unsolicited fax problem which would be less restrictive and that this shows § 227(b)(1)(C) is too broadly drawn.  FC contends in particular that Congress could have adopted an opt out mechanism that would require fax recipients to declare their desire not to receive unsolicited

commercial faxes, rather than requiring fax advertisers to secure the consent of potential recipients.[7]

We disagree that TCPA is unconstitutionally broad. The Supreme Court has made it clear that "the 'least restrictive means' test has no role in the commercial speech context." Florida Bar, 515 U.S. at 632. Instead, what is required

> "is a 'fit' between the legislature's ends and the means chosen to accomplish those ends," a ["]fit that is not necessarily perfect, but reasonable; that represents not necessarily the single best disposition but one whose scope is 'in proportion to the interest served,' that employs not necessarily the least restrictive means but . . . a means narrowly tailored to achieve the desired objective."

Id. (second alteration in original) (quoting Bd. of Trs. of State Univ. of N.Y. v. Fox, 492 U.S. 469, 480 (1989)). Section 227(b)(1)(C) satisfies this standard. Advertisers remain free to publicize their products through any legal means; they simply cannot do so through an unsolicited fax. TCPA does not act as a total ban on fax advertising. Advertisers may obtain consent for their faxes through such means as telephone solicitation, direct mailing, and interaction with customers in their shops. Cf. Van Bergen, 59 F.3d at 1556 ("Live telephone calls . . . and bulk mailings are all inexpensive and effective [means of communication]."). While it is true that the effect of TCPA will be that some consumers will not receive unsolicited advertisements they might have appreciated, under the approach advocated by FC

_____

[7]FC suggests, for example, that Congress could have implemented a scheme under which an advertiser is prohibited from sending a second fax to a person who has previously indicated that he does not wish to receive such faxes, similar to the manner in which live telemarketing is regulated under TCPA, see 47 U.S.C. § 227(c)(5); 47 C.F.R. § 64.1200(e)(2). Another suggested alternative is a nationwide no fax list. FC also points out that several states have regulated unsolicited fax advertising by imposing strict page and time-of-day limits. See, e.g., N.Y. Gen. Bus. Law § 396-aa(1); N.D. Cent. Code § 51-07-23; Wis. Stat § 134.72.

there would always be individuals suffering costs and interference from unwanted advertisements. It was not unreasonable for Congress to choose a system that protects those who would otherwise be forced to bear unwanted burdens over those who wish to send and receive unsolicited fax advertising. Given the cost shifting and interference imposed by unsolicited commercial faxes and the many alternatives left available to advertisers, TCPA's approach is "'in proportion to the interest served . . . [and is] narrowly tailored to achieve the desired objective.'" Florida Bar, 515 U.S. at 632 (internal quotation marks omitted) (quoting Fox, 492 U.S. at 480).

The cases in which the Supreme Court has recently struck down restrictions on commercial speech for being too broadly drawn, see W. States, 122 S. Ct. at 1506; Lorillard, 533 U.S. at 561; 44 Liquormart, Inc. v. Rhode Island, 517 U.S. 484, 507 (1996) (opinion of Stevens, J., joined by Kennedy, Souter, and Ginsburg, JJ.); Coors, 514 U.S. at 490–91, had different characteristics than we are faced with here. First, those cases dealt with concerns not at issue here. The legislation there banned dissemination of truthful commercial information, either to "prevent members of the public from making bad decisions with the information," W. States, 122 S. Ct. at 1507, or to advance a governmental interest that could be furthered "without regulating speech," 44 Liquormart, 517 U.S. at 503 (opinion of Stevens, J., joined by Kennedy and Ginsburg, JJ.). See W. States, 122 S. Ct. at 1500–01, 1505 (striking down federal restriction on advertisement and promotion of particular drugs where goal was to prevent large scale manufacturing); Lorillard, 533 U.S. at 533, 566–67, 569 (finding unconstitutional Massachusetts regulation of advertising to reduce underage tobacco use, but upholding restriction on manner of sale); 44 Liquormart, 517 U.S. at 489–90 (striking effort to promote temperance by prohibiting advertisements of retail prices for alcoholic beverages); Coors, 514 U.S. at 483–84. In this case, the TCPA ban on unsolicited commercial fax advertisements is neither intended to protect the public from the content of the speech nor to implement policy unrelated to the delivery of the message itself. In prohibiting these fax advertisements, Congress was not concerned with the effect of the content of the

advertisements, but rather with the effect of the act of communicating. This case is therefore more similar to Florida Bar where the Court upheld a ban on "targeted direct-mail solicitations [of] victims and their relatives [by attorneys] for 30 days following an accident or disaster." 515 U.S. at 620. The Florida Bar Court emphasized the fact that "the harm posited . . . is as much a function of simple receipt of targeted solicitations . . . as it is a function of the letters' contents." Id. at 631. The harm associated with unsolicited fax advertisements is similarly not related to the content of the messages.

Second, the regulations at issue in three of the cases cited by FC were so broad as to "constitute nearly a complete ban on the communication of truthful information [about a commercial product]." Lorillard, 533 U.S. at 562; see W. States, 122 S. Ct. at 1502 (flat ban on all advertising of compounded drugs absent FDA approval of drug); 44 Liquormart, 517 U.S. at 530–31 (opinion of O'Connor, J., joined by Rehnquist, C.J., Souter, J., and Breyer, J.) ("No channels exist at all to permit [liquor merchants] to publicize the price of their products."). Section 227(b)(1)(C) does no such thing, and advertisers remain free to publicize their products through many legal means other than an unsolicited fax. Moreover, TCPA has not eliminated the fax machine as an available channel of communication. If an advertiser wishes to promote its business by fax, there are many ways for it to secure the consent of willing potential customers, just as in Florida Bar where there were "many other ways for injured Floridians to learn about the availability of legal representation." 515 U.S. at 633; see 44 Liquormart, 517 U.S. at 502 (opinion of Stevens, J., joined by Kennedy and Ginsburg, JJ.) ("[W]e upheld [the Florida Bar regulation] largely because it left so many channels of communication open to Florida lawyers.").

We conclude that the TCPA restriction on unsolicited commercial fax advertisements achieves a reasonable fit between the means it adopts and the ends it seeks to serve. It thus satisfies the fourth element of the Central Hudson test. See Florida Bar, 515 U.S. at 632.

## III.

We conclude that 47 U.S.C. § 227(b)(1)(C) satisfies the constitutional test for regulation of commercial speech and thus withstands First Amendment scrutiny. There is a substantial governmental interest in protecting the public from the cost shifting and interference caused by unwanted fax advertisements, and the means chosen by Congress to address these harms directly and materially advances the governmental interest. The statute is also narrowly tailored to create a reasonable fit with its objective. Accordingly, we reverse the judgment dismissing the claims asserted under § 227(b)(1)(C) and remand the case to the district court for further proceedings consistent with this opinion.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

-17-