DESTINATION VENTURES, LTD., an Oregon corporation; Lutz Paralegal Services, Inc., a New York corporation; Porter Capital Corporation, a Delaware corporation; National Faxlist, a New Jersey sole proprietorship; and James R. Lock, dba Lock Travel Service, Plaintiffs,

v.

FEDERAL COMMUNICATIONS COMMISSION, a federal agency, and James H. Quello, in his capacity as Chairman of the Federal Communications Commission, Defendants.

Civ. No. 93–737–AS.

United States District Court,
D. Oregon.

Jan. 20, 1994.

Charles F. Hinkle and Julianne Ross Davis, Stoel Rives Boley Jones & Grey, Portland, OR, for plaintiffs.

Jack C. Wong, U.S. Attys. Office, Portland, OR, Frank W. Hunger, Asst. Atty. Gen., Theodore C. Hirt, and Pamela J. Eppli, U.S. Dept. of Justice, Civ. Div. Fed. Prog. Branch, Washington, DC, for defendants.

OPINION AND ORDER

FRYE, District Judge:

The matter before the court is the objections of the plaintiffs to the Findings and Recommendation filed on December 14, 1993 by the Honorable Donald C. Ashmanskas, United States Magistrate Judge.

The plaintiffs filed this action seeking to enjoin the defendants, the Federal Communications Commission (FCC) and James H. Quello, from enforcing 47 U.S.C. § 227(b)(1)(C), which is a part of the Telephone Consumer Protection Act of 1991, and which provides, in pertinent part:

**(b) Restrictions on the use of automated telephone equipment**

**(1) Prohibitions**

It shall be unlawful for any person within the United States—

. . . .

(C) to use any telephone facsimile machine, computer, or other device to send an unsolicited advertisement to a telephone facsimile machine.

47 U.S.C. § 227(b)(1)(C).

The term "unsolicited advertisement" is defined as "any material advertising the commercial availability or quality of any property, goods, or services which is transmitted to any person without that person's prior express invitation or permission." 47 U.S.C. § 227(a)(4).

The plaintiffs moved the court for an order of summary judgment on the grounds that the language of 47 U.S.C. § 227 violates their free speech and equal protection rights. The defendants moved to dismiss this action.

Magistrate Judge Ashmanskas concluded that the statute, a content-based restriction on commercial speech, met the constitutional requirement that it directly advances a substantial governmental interest in a manner that is no more extensive than necessary to serve that interest. Magistrate Judge Ashmanskas has recommended to this court that, in light of the conclusion of the court that the statute is constitutionally valid, the plaintiffs' motion for summary judgment be denied and the defendants' motion to dismiss be granted.

The plaintiffs object to the Findings and Recommendation of Magistrate Judge Ashmanskas on the grounds that Magistrate Judge Ashmanskas erred in finding that the statute directly advanced a substantial governmental interest and erred in finding that there is a reasonable fit between the legitimate interests advanced and the means chosen to serve those interests.

Pursuant to 28 U.S.C. § 636(b)(1), the court has made a *de novo* determination of the entire matter presented. The court adopts the Findings and Recommendation of Magistrate Judge Ashmanskas filed December 14, 1993 as its own opinion. The defendants' motion to dismiss (# 11) is GRANTED, and the plaintiffs' motion for summary judgment (# 16) is DENIED.

IT IS SO ORDERED.

## FINDINGS AND RECOMMENDATION

ASHMANSKAS, United States Magistrate Judge:

Plaintiffs include small businesses that have relied upon the availability of facsimile ("fax") advertising to promote their various enterprises, and a businessman who wants to continue receiving unsolicited faxes. They filed their complaint in June 1993, seeking to enjoin the Federal Communications Commission ("FCC") from enforcing 47 U.S.C. § 227(b)(1)(C), part of the Telephone Consumer Protection Act of 1991 ("TCPA").

The TCPA amended the Communication Act of 1934 and provides in pertinent part:

(b)(1) PROHIBITIONS—It shall be unlawful for any person within the United States—

\* \* \* \* \* \*

(C) to use any telephone facsimile machine, computer, or other devise to send an unsolicited advertisement to a telephone facsimile machine. . . .

47 U.S.C. § 227(b)(1)(C) (1991).

"Unsolicited advertisement" is defined as "any material advertising the commercial availability or quality of any property, goods or services which is transmitted to any person without that person's prior express invitation or permission." 47 U.S.C. § 227(a)(4).

Plaintiffs ask that the FCC be enjoined from enforcing this section, and request summary judgment on grounds that the statutory language violates their free speech and equal protection rights. The defendant moves to dismiss plaintiffs' action. For the reasons that follow, plaintiffs' motions should

be denied, and defendant's motion to dismiss should be granted.

## Legal Standards

■ A motion to dismiss under Fed. R.Civ.P. 12(b)(6) will only be granted if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Gibson v. United States,* 781 F.2d 1334, 1337 (9th Cir. 1986), *cert. denied,* 479 U.S. 1054, 107 S.Ct. 928, 93 L.Ed.2d 979 (1987). The review is limited to the complaint, and all allegations of material fact are taken as true and viewed in the light most favorable to the non-moving party. *Cassettari v. Nevada County, Cal.,* 824 F.2d 735, 737 (9th Cir.1987).

Fed.R.Civ.P. 56(c) authorizes summary judgment if no genuine issue exists regarding any material fact and the moving party is entitled to judgment as a matter of law. The moving party must show an absence of an issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Once the moving party shows the absence of an issue of material fact, the nonmoving party must go beyond the pleadings and designate specific facts showing a genuine issue for trial. *Id.* at 324, 106 S.Ct. at 2553. On a motion for summary judgment, all reasonable doubt as to the existence of a genuine issue of fact should be resolved against the moving party. *Hector v. Wiens,* 533 F.2d 429, 432 (9th Cir.1976).

The parties agree that the restriction upon unsolicited fax advertisements is content-based, and that, as a restriction on commercial speech, the statute would pass constitutional muster if it directly advances a substantial governmental interest in a manner that is no more extensive than necessary to serve that interest. *Central Hudson Gas & Electric Corp. v. Public Service Com.,* 447 U.S. 557, 564–66, 100 S.Ct. 2343, 2350–51, 65 L.Ed.2d 341 (1980).

■ More recently, the Supreme Court has said that restrictions on commercial speech must: (1) implement a substantial governmental interest; (2) directly advance that interest; and (3) be narrowly tailored to achieve the desired objective. *See Board of Trustees v. Fox,* 492 U.S. 469, 109 S.Ct. 3028, 106 L.Ed.2d 388 (1989).

## Analysis

The court must first determine whether the restrictions upon unsolicited fax advertising are constitutional under the *Central Hudson* and *Fox* tests.

### Substantial government interest

A governmental body has an "obligation to demonstrate that it is regulating speech in order to address what is in fact a serious problem." *Edenfield v. Fane,* — U.S. —, —, 113 S.Ct. 1792, 1803, 123 L.Ed.2d 543 (1993). The obligation of justifying a restriction upon commercial speech

> is not satisfied by mere speculation or conjecture; rather a governmental body seeking to sustain a restriction on commercial speech must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree.

*Id.* at —, 113 S.Ct. at 1800.

Plaintiffs contend that Congress has failed to show that its interest concerning unsolicited advertisement faxes is substantial. Plaintiffs refer to the absence of any "longstanding historical concern over the receipt of unsolicited fax messages," or any statement of "substantial interest" within the statute. Memorandum in support of Plaintiff's motion for summary judgment at 16.

While there is relatively little in the way of a historical record regarding a specific congressional concern for unsolicited fax advertising, that may have more to do with the unprecedented medium of the facsimile rather than any lack of a substantial interest in the exploitation of that medium. Congressional efforts to protect consumers from harm (economic and otherwise) and its interest in the relationship between advertiser and consumer is well-established and not disputed by the parties.

> Commercial speech ... is "linked inextricably" with the commercial arrangement that it proposes, *Friedman v. Rogers,* 440 U.S. 1, 10, n. 9 [99 S.Ct. 887, 894, n. 9, 59 L.Ed.2d 100] (1979), so the State's interest

in regulating the underlying transaction may give it a concomitant interest in the expression itself.

*Edenfield,* —— U.S. at ——, 113 S.Ct. at 1798 (fraudulent or deceptive advertising may be banned without further justification); *See also Metromedia, Inc. v. San Diego,* 453 U.S. 490, 507, 101 S.Ct. 2882, 2892, 69 L.Ed.2d 800 (1981) (plurality opinion) (city has a substantial interest in regulating advertisements out of a concern for aesthetics and traffic safety); *United States v. Edge Broadcasting Co.,* —— U.S. ——, 113 S.Ct. 2696, 125 L.Ed.2d 345 (1993) and *Posadas de Puerto Rico Associates v. Tourism Co. of Puerto Rico,* 478 U.S. 328, 106 S.Ct. 2968, 92 L.Ed.2d 266 (1986) (the government may legislate the advertising of gambling out of a concern for the effect of such advertising); *Ohralik v. Ohio State Bar Asso.,* 436 U.S. 447, 462, 98 S.Ct. 1912, 1921, 56 L.Ed.2d 444 (1978) (protection of the public from solicitations pressed with such frequency or vehemence as to be harassing is a legitimate and important state interest); 15 U.S.C. § 1335 (congressional ban on the advertisement of cigarettes).

While the challenged portion of TCPA is not directed toward any specific commercial arrangement being proposed by advertising, the congressional committees that considered the legislation identified other harms associated with unsolicited fax advertising. The House Committee on Energy and Commerce noted that "the proliferation of facsimile machines has been accompanied by explosive growth in unsolicited facsimile advertising, or 'junk fax.'" H.R.Rep. No. 317, 102d Cong., 1st Sess. 10 (1991). The Report continues:

Facsimile machines are designed to accept, process, and print all messages which arrive over their dedicated lines. The fax advertisers take advantage of this basic design by sending advertisements to available fax numbers, knowing that it will be received and printed by the recipient's machine. This type of telemarketing is problematic for two reasons. First, it shifts some of the costs of advertising from the sender to the recipient. Second, it occupies the recipient's facsimile machine so that it is unavailable for legitimate business messages while processing and printing the junk fax.

\* \* \* \* \* \*

In the case of fax advertising ... the recipient assumes both the cost of the associated with the use of the facsimile machine and, the cost of the expensive paper used to print out facsimile messages. It is important to note that these costs are borne by the recipient of the fax advertisement regardless of their interest in the product or service being advertised.

In addition to the costs associated with fax advertisements, when a facsimile machine is receiving a fax, it may require several minutes or more to process and print the advertisement. During that time, the fax machine is unable to process actual business communications. \* \* \* Since businesses have begun to express concern about the interference, interruptions, and expense that junk fax have placed upon them, states are taking action to eliminate these telemarketing practices. Connecticut and Maryland have enacted laws banning the use of facsimile machines for unsolicited advertising. Similar bills are pending in the legislatures of about half the states.

*Id.* at 10, 25.

Testimony before the Subcommittee on Telecommunications and Finance also indicates that Congress was identifying and addressing a substantial interest:

Today the subcommittee will look at problems that have received attention from the public and from Congress—[including] ... the unauthorized sending of advertisements through fax machines....

\* \* \* \* \* \*

[A] festering problem has arisen from the so-called "junk fax." Junk fax is more than merely irritating. It represents an unfair shifting of the cost of advertising from the advertiser to the unwitting customer. Also ... unsolicited and unwanted faxes can tie up a machine for hours and thwart the receipt of legitimate and important messages.

Hearing Before House Subcomm. on Telecommunications and Finance, 102d Cong., 1st Sess. 3–4 (1991).

The subcommittee also heard testimony from several authorities. Michael Jacobson, cofounder of the Center for the Study of Commercialism testified regarding his office's receipt of "numerous nuisance faxes." He noted that these messages use the recipient's paper and delay the transmission of other legitimate messages. *Id.* at 41.

Thomas Beard also testified on behalf of the National Association of Regulatory Utility Commissioners (NARUC). The statement he submitted to Congress reads in part:

> The junk fax advertiser is a nuisance who wants to print [his or her advertisement] on your paper. That call seizes your fax machine so that it is not available for calls you want or need. * * * As fax machines have become faster and easier to use, use of this form of communication has shown tremendous growth. Although I have seen no figures on national usage, I am judging by my own increasing reliance on the fax.
>
> Meeting in Washington last year, the NARUC reviewed the situation and passed a resolution urging Congress to enact legislation on the subject.

*Id.* at 52.

Janlori Goldman, legislative counsel for the American Civil Liberties Union, also testified that her organization supported restrictions on unsolicited fax advertisements, because of the economic burdens those messages place on the recipients. *Id.* at 58.

■ This court concludes that Congress' interest in protecting consumers from the economic harm resulting from the "unfair shifting of the cost of advertising from the advertiser to the unwitting customer" and other harms that could be associated with unsolicited fax solicitations (unsolicited faxes can interfere with a machine's use) is a substantial interest which is identified in the TCPA's legislative history.

The Supreme Court ruled in *Edenfield* that a governmental body seeking to sustain a restriction on commercial speech must demonstrate that the harms it recites are real; the legislative record concerning the TCPA does that. Despite the lack of detailed studies, there were repeated, uncontradicted references made before Congress describing how facsimile advertising shifts economic burdens from the advertiser to the consumer. Furthermore, there were references to the fact that half of the states are considering restrictions on unsolicited fax advertising. While there was an absence of statistical data or national surveys addressing this interest, Congress legitimately relied upon the testimony from authorities, as well as the contemporaneous state laws and media reports.

### Direct advancement

Under this burden, the court must determine whether "the challenged regulation advances [the government's] interests in a direct and material way." *Edenfield,* —— U.S. at ——, 113 S.Ct. at 1798. Plaintiffs reiterate that because Congress made no attempt to determine the scope of the "unsolicited fax" problem, the degree of direct advancement can only be a matter of speculation.

Because Congress has addressed a substantial interest in protecting consumers from the economic harms inflicted through unsolicited advertisement faxes, however, the subsequent banning of those unsolicited faxes directly advances that interest.

### Narrowly tailored

The final requirement for restrictions on commercial speech is that the requirement must be narrowly tailored to achieve the desired objective. It is the government's burden to establish that a reasonable fit exists between the legislation it seeks to enact and the burden the law would place upon constitutional rights. *Fox,* 492 U.S. at 480, 109 S.Ct. at 3035.

In *Cincinnati v. Discovery Network, Inc.,* —— U.S. ——, 113 S.Ct. 1505, 123 L.Ed.2d 99 (1993), the Court concluded that the city failed to establish that a reasonable fit existed between the restrictions being placed upon commercial speech through a ban on commercial handbill newsracks, and the goals of safety and aesthetics the city sought to serve by invoking such a ban. The Court concluded that the city failed to calculate carefully the costs and benefits associated

with the burden it attempted to place on speech.

The Court held:

In the absence of some basis for distinguishing between "newspapers" and "commercial handbills" that is relevant to an interest asserted by the city, we are unwilling to recognize Cincinnati's bare assertion that the "low value" of commercial speech is a sufficient justification for its selective and categorical ban on newsracks dispensing "commercial handbills." ... Because the distinction Cincinnati has drawn has absolutely no bearing on the interests it has asserted, we have no difficulty concluding ... that the city has not established the "fit" between its goals and its chosen means that is required by our opinion in *Fox*.

*Discovery Network*, —— U.S. at ——, 113 S.Ct. at 1516.

Plaintiffs contend that the TCPA creates similarly flawed distinctions by imposing a limited and selective prohibition of only a certain kind of unsolicited fax message. Plaintiffs conclude that the statute violates the First Amendment by arbitrarily prohibiting some, but not all, faxes, and failing to evidence a "reasonable fit" between Congressional goals and the means chosen to accomplish those goals.

The premise of plaintiffs' argument is that the TCPA exempts non-profit organizations from the ban on unsolicited advertising. This premise is flawed.

Plaintiffs attempt an analogy to the TCPA's portion of the statute prohibiting the initiation of any telephone call to any residential telephone line using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party. Under that portion, Congress allowed the FCC to exempt calls that were not made for a "commercial purpose." 47 U.S.C. § 227(b)(2)(B)(i). By using the phrase "commercial purpose" in that portion of the statute, Congress intended to exclude calls made by non-profit organizations. A constitutional challenge was brought successfully:

there is no reasonable fit between the goals and the means chosen to reach those goals in the distinction Congress drew between commercial and noncommercial messages under the TCPA[.] ... 47 U.S.C. § 227(b)(2)(B)(i), which permits the FCC to exempt from the restrictions of TCPA those calls not made for commercial purposes, is an impermissible means of responding to Congress' legitimate interests in protecting residential privacy.

*Moser v. F.C.C.*, 826 F.Supp. 360, 366 (D.Or. 1993), *appeal pending*, No. 93–35686 (9th Cir.).

Plaintiffs assert that the prohibition on unsolicited fax advertising contains the same arbitrary distinction between commercial and non-commercial communications, because the fax portion of the TCPA defines "unsolicited advertisement" as "any material advertising the *commercial availability* or quality of any property, goods or services which is transmitted to any person without that person's prior express invitation or permission." 47 U.S.C. § 227(a)(4) (emphasis added). Plaintiffs contend the phrase "commercial availability" should be read in the identical way the phrase "commercial purpose" was when used earlier in the statute to exempt non-profit organizations from the ban on telephone solicitations. That is, "commercial availability" should be interpreted under the fax portion as exempting non-profit organizations from the prohibition against unsolicited fax advertising. Plaintiffs focus on the word "commercial" common to both sections, and refer to the rule of statutory construction holding that words used more than once in the same statute have the same meaning. *Boise Cascade Corp. v. U.S.E.P.A.*, 942 F.2d 1427, 1432 (9th Cir.1991).

▮ The prohibition on unsolicited faxes, however, targets any fax that advertises the "commercial availability" of a good or service. This prohibition is distinct from the attempted ban on telephone solicitations made for a "commercial purpose." Under the TCPA as drafted, a non-profit organization would not be said to have a "commercial purpose" if it wanted to solicit on its own (non-profit) behalf over the telephone, but it still could not send unsolicited faxes addressing the "commercial availability" of goods or services it hoped to sell.

Unlike the infirm ordinance addressed in *Discovery Network*, the TCPA serves the specific purpose for which it was intended. First, the stated the purpose of ordinance in *Discovery Network* was to alleviate street clutter. The city of Cincinnati relied upon the ordinance to ban commercial newsracks, which made up only a small fraction of the newsracks in the city. The targeting of *commercial* newsracks was unrelated to the problem of cluttered streets.

The TCPA, however, has the purpose of preventing the unfair shifting of advertising costs from the advertiser to the unwilling consumer. The ban on all unsolicited advertisement faxes, therefore, represents a reasonable fit with the statute's purpose. Unsolicited advertisements from any source are banned, to serve the specific purpose of protecting consumers from being burdened by the unfair shifting of advertising costs.[1]

Plaintiffs' related argument that Congress failed to consider less burdensome alternatives is also unpersuasive. The Supreme Court has said a properly tailored restriction "focuses on the source of the evils the [government] seeks to eliminate ... and eliminates them without at the same time banning or significantly restricting a substantial quantity of speech that does not create the same evils." *Ward v. Rock Against Racism*, 491 U.S. 781, 799 n. 7, 109 S.Ct. 2746, 2758 n. 7, 105 L.Ed.2d 661 (1989).

In *Ward* the Court rejected the proposition that a restriction is improperly tailored "simply because there is some imaginable alternative that might be less burdensome on speech." *Id.* at 797, 109 S.Ct. at 2757. A judge need not agree with the decisionmaker as to the most appropriate method for promoting a governmental interest, *id.* at 800, 109 S.Ct. at 2758; as long as there is a reasonable fit between the restriction and the interest served, the manner of regulation is left to the decisionmaker. *Fox*, 492 U.S. at 480, 109 S.Ct. at 3035.

Plaintiffs' suggested alternatives (creating a "do not fax" list; regulating the hours of fax advertising; limiting the number or frequency of transmissions) fail to establish that the legislation Congress did choose is improperly tailored for its targeted goal, protecting consumers from the burdens associated with receiving unsolicited fax advertisements.

## Equal Protection

Finally, plaintiffs also argue that the TCPA unfairly targets only a certain classification of fax transmitters. Equal protection doctrines require that all persons in similar circumstances be treated alike. Congress cannot legislate different treatment for classes of people when those classes are based on criteria unrelated to the objective of the statute. If the statute does not burden a suspect class or a fundamental interest, it will be overturned only if there is no *rational basis* for the statute.

If, however, any state of facts reasonably may be conceived to justify the distinction made by the statute, the statute will not be invalidated on equal protection grounds. *See Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 101 S.Ct. 715, 66 L.Ed.2d 659 (1981).

Plaintiffs contend there is no rational basis for distinguishing (1) senders of advertisements from those who send any other kind of message; (2) advertisements from other business messages; or (3) commercial faxes from those advertisements not addressing the "commercial availability" of goods or services. Because there is no rational basis for these classifications, plaintiffs contend, the TCPA violates the due process clause of the Fifth Amendment.

---

1. Plaintiffs also contend the statute unfairly burdens business relationships that would otherwise welcome unrestricted fax transmissions because it does not permit unsolicited faxes even when the sender and recipient enjoy an established business relationship. The government responds that the TCPA permits unsolicited faxes in established business relationships because the FCC concluded that a solicitation can be deemed invited or permitted when a prior business relationship exists. The significance of whether established business relationships are initially burdened appears relatively minor. Both parties acknowledge that the statute allows fax recipients to agree to accept unsolicited advertising, and those in established business relationships are free to take advantage of such an opportunity.

In this case, however, there is clearly a rational basis for the distinctions drawn by the challenged portion of the TCPA. The TCPA was drafted in part to protect consumers from burdens caused by the transmitting of unsolicited fax advertising; accordingly, there is a rational basis for the TCPA's ban.

### Conclusion

Congress drafted the portion of the TCPA challenged by plaintiffs as a means to directly advance the substantial governmental interest of protecting consumers against burdens created by the transmission of unsolicited fax advertisements. The ban against such advertisements imposed by the TCPA is narrowly tailored and no more extensive than necessary to serve that valid, substantial governmental interest. Accordingly, defendant's motion to dismiss (doc. #11) should be GRANTED, and plaintiffs' motion for summary judgment (doc. #16) should be DENIED.

DATED this 14th day of December, 1993.