196 F.Supp.2d 920 (2002)
State of MISSOURI, ex rel. Jeremiah W. (Jay) NIXON, Attorney General, Plaintiff,
v.
AMERICAN BLAST FAX, INC., et al., Defendants.
No. 4:00CV933 SNL.
United States District Court, E.D. Missouri, Eastern Division.
March 13, 2002.
*921 Jill C. LaHue, J. Robert Sears, Attorney General of Missouri, Assistant Attorney General, Jefferson City, MO, for Jeremiah W. Nixon.
Deborah L. Golemon, Office of U.S. Attorney, St. Louis, MO, Theodore C. Hirt, Karyn A. Temple, U.S. Department of Justice, Civil Division, Washington, DC, for United States.
Don M. Downing, Shonagh K. Clements, Stinson and Mag, St. Louis, MO, for American Blast Fax, Inc.
Mary Ann L. Wymore, John E. Petite, Greensfelder and Hemker, St. Louis, MO, Arthur W. Lefco, Michael P. Broadhurst, Cozen and O'Connor, Philadelphia, PA, for Fax.com, Inc.

MEMORANDUM OPINION
LIMBAUGH, Senior District Judge.
This matter is before the Court on defendant American Blast Fax, Inc.'s motion to dismiss (# 9) and defendant Fax.com Inc.'s motion to dismiss.[1] The underlying lawsuit alleges that defendants violated the Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227, by sending unsolicited facsimile advertisements.[2] Plaintiff also alleges that defendants violated the Missouri Merchandising Practices Act (MPA), Mo.Rev.Stat. § 407.010, by misrepresenting to Missouri consumers that the fax messages were sent in accordance with federal law. Defendants contend that § 227 of the TCPA violates the First Amendment right of freedom of speech. They also contend that the MPA claim is based primarily on the assumption that defendants' conduct violates the TCPA, and therefore, that claim must also fail. The United States, eo nomine, and on behalf of the Federal Communications Commission (FCC), has intervened in this cause of action, in order to defend the constitutionality of the TCPA.

Standard
Defendants filed motions to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). If, on a 12(b)(6) motion, matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56. The Court ordered a hearing in this cause of action and listened to testimony for two days. Because these were matters presented outside the pleadings, the motions to dismiss have been converted to those for summary judgment. Therefore, the standard for summary judgment is proper for these motions.
Courts have repeatedly recognized that summary judgment is a harsh remedy that should be granted only when the moving party has established his right to judgment with such clarity as not to give rise to controversy. New England Mut. Life Ins. Co. v. Null, 554 F.2d 896, 901 (8th Cir.1977). However, summary judgment motions "can be a tool of great utility in removing factually insubstantial cases *922 from crowded dockets, freeing courts' trial time for those that really do raise genuine issues of material fact." Mt. Pleasant v. Associated Elec. Coop., Inc., 838 F.2d 268, 273 (8th Cir.1988).
Pursuant to Federal Rule of Civil Procedure 56(c), a district court may grant a motion for summary judgment if all the information before the court demonstrates that "there is no genuine issue as to a material fact and the moving party is entitled to judgment as a matter of law." Poller v. Columbia Broad. Sys., Inc., 368 U.S. 464, 467, 82 S.Ct. 486, 488, 7 L.Ed.2d 458 (1962). The burden is on the moving party. Mt. Pleasant, 838 F.2d at 273. After the moving party discharges this burden, the nonmoving party must do more than show that there is some doubt as to the facts. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Instead, the nonmoving party bears the burden of setting forth specific facts showing that there is sufficient evidence in its favor to allow a jury to return a verdict for it. Celotex Corp. v. Catrett, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).
In passing on a motion for summary judgment, the court must review the facts in a light most favorable to the party opposing the motion and give that party the benefit of any inferences that logically can be drawn from those facts. Buller v. Buechler, 706 F.2d 844, 846 (8th Cir.1983). The court is required to resolve all conflicts of evidence in favor of the nonmoving party. Robert Johnson Grain Co. v. Chem. Interchange Co., 541 F.2d 207, 210 (8th Cir.1976).

Background
Defendant, American Blast Fax, Inc., is a Texas corporation, in the business of providing fax advertising services in the state of Missouri.[3] Defendant, Fax.com Inc., is a Delaware corporation doing business out of California. It transmits advertisements from California to telephone fac-simile machines in Missouri. The Missouri Attorney General brought the instant cause of action, alleging that defendants violate the TCPA by sending fax advertisements when they have not received the express invitation or permission of persons to whom copies of advertisements are faxed. Defendants filed motions to dismiss arguing that the specific provision of the TCPA regarding unsolicited fax advertisements is unconstitutional.
In an order dated April 3, 2001, the Court held that the Central Hudson test was the proper standard to be used in this cause of action to analyze the restrictions on commercial speech. See Central Hudson Gas & Electric Corp. v. Public Serv. Comm'n of NY, 447 U.S. 557, 566, 100 S.Ct. 2343, 2351, 65 L.Ed.2d 341 (1980). The Court also held that the Government bears the burden of justifying the restrictions on commercial speech which the TCPA imposes. See Edenfield v. Fane, 507 U.S. 761, 770, 113 S.Ct. 1792, 1800, 123 L.Ed.2d 543 (1993). Finally, the Court noted that there was no evidence before the Court satisfying this burden, but that the Court would offer the government an opportunity to meet its burden by conducting a hearing. Soon after the April 3, 2001 order, the Court notified the United States that there was going to be a hearing regarding the constitutionality of 42 U.S.C. § 227(b)(1)(C). On May 8, 2001, the Court granted the United States motion to intervene, eo nomine, and on behalf of the *923 Federal Communications Commission (FCC).
A hearing was held on July 9 and 10, 2001, and counsel for Fax.com, the State of Missouri, and the United States, were all present.[4] There were two motions in limine pending at the time of the hearing which the Court indicated it would take with the case. Both motions were filed by Fax.com, the first of which requested that the Court exclude such evidence of whether unsolicited faxes are annoying or offensive. The Court at this time is going to deny this motion in limine. The Court agrees with Fax.com's recitation of the law regarding this issue; however, the Court finds that the reasons for prohibiting the sending of unsolicited faxes are relevant to its inquiry, even if those reasons are not valid under the law. The second motion requested that the Court exclude all evidence regarding Fax.com's business practices. The Court will also deny this motion. This request is considerably broad, and although, not all of Fax.com's business practices may be relevant, some of them could be, and for that reason the Court is denying the motion.
There were many objections to exhibits during the hearing, which the Court took with the case. After careful consideration of all objections to exhibits, all said objections are hereby overruled with one exception. Exhibit 2 was an apparent printout of Fax.com's web page. The State argues that it can avoid the hearsay problems associated with web sites because it is an admission by a party opponent. However, the real problem in the document was that it was missing portions of the wording on the right margin. In other words, it was an incomplete copy of the actual web page. As was demonstrated at the hearing, portions of sentences were cut off, and nobody, including the witness who had identified the document, knew what words were missing on many of the pages. Because Exhibit 2 was not a complete and accurate representation of the website, the Court will sustain Fax.com's objection to Exhibit 2. All other exhibits offered into evidence during the hearing and accepted subject to objections are now received into evidence. If the Court does not refer to some of these exhibits, it is only because the Court found them to be unpersuasive.
The State of Missouri presented five witnesses during the hearing. The first, Greg Houser, works at Pitney Bowes and sells fax machines. He also does cost analysis for his customers and he gave some testimony as to the cost of supplies in receiving faxes. He estimated that it would cost someone between 6½ and 17 cents to receive a faxed advertisement depending on the type of facsimile machine.[5] However, he based these figures on retail prices, and as he admitted on cross, very few people actually pay retail prices. Large companies negotiate for much less, and small companies or those working out *924 of the home, go to places such as Office Depot where sales are often run.
The second witness to testify for the State was Don Little, an investigator with the Missouri Attorney General's office. He identified 229 allegedly unsolicited[6] faxes which the Missouri Attorney General's office received from July 25, 2000 to June 5, 2001. These faxes were sent to five or more fax machines in the Attorney General's St. Louis offices throughout those ten and a half months. There was some question as to whether all of these faxes were advertisements as defined by the TCPA. There were some polls which did not advertise anything. There were faxes that stated "Get Paid To Enjoy Yourself" "Get Paid to Diet." These do not appear on the face to be advertising the commercial availability of property, goods, or services. There are others that were questionable, but the Court is not going to make a determination of whether they fall within the definition provided by the statute.[7]
Dan Drissell, a State Farm insurance agent, also testified for the State. He runs a small office with only three other employees, and he described the problems associated with his business in receiving unsolicited fax advertisements. He testified that the faxes tie up his phone lines for phone calls and other faxes, and that the faxes cost him money for tangible items such as paper and ink cartridges, as well as the time his staff has to spend retrieving these faxes from the fax machine. However, Mr. Drissell did not even estimate how much these unsolicited faxes cost his business per month or even per year. He also did not testify that he had received complaints from his customers of how they could not reach him by phone or fax because the lines were busy, nor did he give an example of a job he was unable to successfully complete because of the sending of an unsolicited fax. Mr. Drissell indicated that three years ago he was receiving five to ten faxes a day, but now he receives only one a day.[8]
The Court then heard testimony from Ian McLauchlan and Scott Nelson. Mr. McLauchlan owns J2 Global Communications and Mr. Nelson is employed there. J2 Global Communications offers a service where people can retrieve their faxes from their email accounts. J2 Global has approximately three million customers in the United States, four million customers worldwide. In providing fax delivery services to its customers, J2 utilizes fax servers connected to T-1 phone lines containing 24 voice channels. J2 assigns between 2,000 and 100,000 telephone facsimile numbers to one 24-channel T-1 line. When a "blast fax" occurs, the same fax is being sent to multiple fax numbers which are in sequential numbers and which come across *925 the same T-1 line. This in turn "clogs" all 24 channels, and other people trying to send a fax would get a busy signal. Mr. McLauchlan also blamed "blast faxing" for some of their servers crashing. Mr. McLauchlan indicated that the number of telephone facsimile numbers assigned to each T-1 line depends on the grade of service which the customer signs up and pays for. For instance, the customer pays for a higher grade of service to be on a T-1 line with only 2,000 numbers. In addition, some customers do not pay anything for J2's service and these people are assigned to the lines with 100,000 numbers.[9] Mr. McLauchlan indicated that the company when making its plans for the future in replacing and upgrading its equipment, is not provisioning its servers to handle any unsolicited faxes even though he is aware that these faxes are going through the company's system.
The United States presented three witnesses. The first, was Penney Olson-Cannon, a switchboard operator at Safeco Insurance Company. Ms. Cannon testified that the sending of unsolicited faxes interrupts the business of Safeco because the faxes are sent to numbers that are not fax numbers. The fax then defaults to the switchboard, tying up the lines, and making customers wait while the operators answer these fax calls. Ms. Cannon testified that she always forwarded the fax to the company's fax machine because she believed that if she hung up, the fax would call her back.[10]
The other two witnesses called by the United States were Robert Buchner, who worked at the Florida Attorney General's office, and Mary Beth Haggerty-Shaw, who was employed at the Washington State Attorney General's Office.[11] Both witnesses said that there has been an increase in the number of complaints they have received regarding unsolicited faxes.[12] Mr. Buchner did not go into detail about the complaints he received, or the faxes attached to the complaints. Ms. Shaw identified three faxing companies and the complaints her office received regarding these fax companies.
Ms. Shaw testified that her office received almost 100 complaints regarding 21st Century Fax. The Court reviewed these complaints, and most of the people complained about the "scams" implicated in the subject matter of the faxes. The Court reviewed the faxes attached to the complaints and found that the majority of them were polls and were not advertising anything. The other faxes stated the following: "Get Paid to Enjoy Yourself" and "Get Paid to Diet." The "scams" were suspected by the public because there was always a charge for the phone call or fax to either cast your vote or to inquire about the diet. In fact, one complaint came from a woman who wanted the faxing company *926 to pay for her phone bill and charges for the phone call regarding the diet. The Court does not consider these faxes covered under the TCPA because they are not advertising the commercial availability of property, goods, or services. In addition, the complaints were not similar to the government's stated concerns regarding fax advertising. These people (with perhaps a few exceptions) were not complaining about these faxes costing them money and time, but rather that these faxes were scamming the public.
Ms. Shaw also testified that her office received 70 complaints regarding Fax.com, and 40-50 complaints regarding American Blast Fax. The time period for these complaints varies. Ms. Shaw testified that complaints against 21st Century covered a span of about a year. The 70 complaints regarding Fax.com began in January 1999 through April or May 2000, and the 40-50 complaints against American Blast Fax were concentrated to April and May 2000.
Defendants presented four witnesses, but the Court will not go into detail on three of them.[13] The Court would like to address the testimony of defendant's witness, Maury Kauffman.[14] Mr. Kauffman testified about future trends in the faxing industry, however, the Court would like to note, that it must rely on the facts as they exist now, rather than rely on speculation of where the faxing industry is headed. Mr. Kauffman did estimate that at the present time it costs about 2 to 3 cents to receive a normal fax. He stated that Pitney Bowes sells higher end toner, and that the numbers supplied by Mr. Houser were dealer list prices and that almost nobody buys toner at list price. Mr. Kauffman also testified that the cost of a telemarketing call to a business is greater than the cost of receiving a fax.[15] He testified that he has compared "fax to telemarketing to direct mail to magazine advertising to other types of marketing." He has determined in analyzing costs to businesses that the "receipt of a telemarketing call is higher by a magnitude" than the receipt of a fax.
Mr. Kauffman also ironically, was a consultant for J2 Global Communications for a period of time, and presently remains a stockholder in the company. He testified that many of J2's own problems regarding the "clogging" of all 24 channels, and the servers crashing, would be ameliorated if they were to "beef up" their system. In addition, Mr. Kauffman testified that J2 is in direct competition with defendants, because J2 also offers fax broadcasting. He testified that they actually have a sales force that is selling fax broadcasting, and *927 that you can sign up for fax broadcasting on J2's website. Finally, Mr. Kauffman testified to all the advantages of fax advertising for both the businesses advertising and the consumers receiving the faxes.

Discussion
The TCPA makes it unlawful for any person "to use any telephone facsimile machine, computer, or other device to send an unsolicited advertisement to a telephone facsimile machine." 47 U.S.C. § 227(b)(1)(C). The term "unsolicited advertisement" is defined as "any material advertising the commercial availability or quality of any property, goods, or services which is transmitted to any person without that person's prior express invitation or permission." § 227(a)(4). The TCPA was enacted in late 1991 and is part of the Communications Act of 1934. 47 U.S.C. § 151 et seq. The provision prohibiting unsolicited faxes was enacted as part of a larger amendment which included restrictions on telephone solicitations and automatic dialing systems. Defendants contend that the provision prohibiting unsolicited faxes violates their freedom of speech as protected by the First Amendment.

I. Standard of Scrutiny
The government has no power to restrict expression because of its message, its ideas, its subject matter, or its content, and with respect to noncommercial speech, the Supreme Court has sustained content-based restrictions only in the most extraordinary circumstances. Bolger v. Youngs Drug Prod. Corp., 463 U.S. 60, 65, 103 S.Ct. 2875, 2879, 77 L.Ed.2d 469 (1983). However, content-based restrictions on commercial speech may be permissible. Id. The speech at issue in this cause of action is commercial,[16] and therefore, the Court must apply the standard which is applicable to commercial speech.
The Court previously held that the Central Hudson test was the proper standard to be used in this cause of action to analyze the restrictions on commercial speech. 447 U.S. at 566, 100 S.Ct. at 2351. This test has been referred to as an "intermediate" level of scrutiny. See Florida Bar v. Went For It, Inc., 515 U.S. 618, 623, 115 S.Ct. 2371, 2375-76, 132 L.Ed.2d 541 (1995).
The Central Hudson test is as follows:
At the outset, we must determine whether the expression is protected by the First Amendment. For commercial speech to come within that provision, it at least must concern lawful activity and not be misleading. Next, we ask whether the asserted governmental interest is substantial. If both inquiries yield positive answers, we must determine whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest.
Central Hudson Gas & Electric Corp. v. Public Serv. Comm'n of NY, 447 U.S. 557, 566, 100 S.Ct. 2343, 2351, 65 L.Ed.2d 341 (1980). The Government bears the burden of identifying a substantial interest and justifying the challenged restriction. New Orleans Broad., 527 U.S. at 183, 119 S.Ct. at 1930. It is well established that the party seeking to uphold a restriction on commercial speech carries the burden of justifying it. Edenfield v. Fane, 507 U.S. 761, 770, 113 S.Ct. 1792, 1800, 123 L.Ed.2d 543 (1993). With this standard in mind, *928 the Court will now turn to the circumstances of this particular cause of action.

II. Application of the Central Hudson Standard
The four parts of the Central Hudson test are not entirely discrete. All are important and, to a certain extent, interrelated: Each raises a relevant question that may not be dispositive to the First Amendment inquiry, but the answer to which may inform a judgment concerning the other three. New Orleans Broad., 527 U.S. at 183-84, 119 S.Ct. at 1930. It is undisputed that the expression at issue in this cause of action is afforded a level of protection under the First Amendment. Defendants' fax advertisements concern lawful activity and are not misleading.[17]
Because fax advertisements are protected under the First Amendment, the Court must first determine if the government has a substantial interest in prohibiting unsolicited fax advertisements. A governmental body seeking to sustain a restriction on commercial speech must demonstrate that the harms it recites are real. This burden cannot be satisfied by mere speculation or conjecture. Edenfield, 507 U.S. at 770-71, 113 S.Ct. at 1800. The Government has the obligation to demonstrate that it is regulating speech in order to address what is in fact a serious problem. Id. at 776, 113 S.Ct. at 1803.
Congress identified in the legislative history, and it is argued by both the Missouri Attorney General and the United States, that the government has two interests in seeking to ban unsolicited fax advertisements. The first is that unsolicited junk faxing shifts advertising costs from the advertiser to the recipient. The second asserted interest is that unsolicited fax advertising occupies a recipient's facsimile machine so that the recipient cannot utilize it for his or her desired business purposes.
The Court has reviewed both the House and Senate Reports and found very little discussion on the specific provision banning unsolicited fax advertisements. S.Rep. No. 102-178 (1991), reprinted in 1991 U.S.C.C.A.N.1968; H.R.Rep. No. 102-317 (1991). The majority of the reports discuss telephone solicitation and automatic dialing systems. The Court also reviewed the hearing before the subcommittee on Telecommunications and Finance with similar results. Telemarketing/Privacy Issues: Hearing Before the Subcommittee on Telecommunications and Finance of the Committee on Energy and Commerce House of Representatives, 102nd Cong. (1991).
In reviewing the legislative history, Congress does express concern with the unfair shifting of advertisement costs from the advertiser to the consumer. The Senate Report states that "unsolicited calls placed to fax machines . . . often impose a cost on the called party (fax messages require the called party to pay for the paper used . . .)[18]." S.Rep. No. 102-178 (1991). This *929 is the only mention of cost-shifting in its report. The House Report contained the following:
The Committee found that when an advertiser sends marketing material to a potential customer through regular mail, the recipient pays nothing to receive the letter. In the case of fax advertisements, however, the recipient assumes both the cost associated with the use of the facsimile machine and, the cost of the expensive paper used to print out facsimile messages. It is important to note that these costs are borne by the recipient of the fax advertisement regardless of their interest in the product or service being advertised.
H.R. Rep. 102-317.
There was also very little in the House and Senate Reports regarding the second asserted interest: that unsolicited fax advertising occupies a recipient's facsimile machine so that the recipient cannot utilize it for his or her desired business purposes. The Senate Report refers to unsolicited fax messages as "detrimental to the owner's uses of his or her fax machine," but does not explain how or why it is detrimental. See S.Rep. No. 102-178 (1991). The House Report contains more: "when a facsimile machine is receiving a fax, it may require several minutes or more to process and print the advertisement. During that time, the fax machine is unable to process actual business communications. Only the most sophisticated and expensive facsimile machines can process and print more than one message at a time."[19] H.R. Rep. 102-317. The Report went on to state that "businesses have begun to express concern about the interference, interruption and expense that junk fax have placed upon them." Id. However, it does not state how many businesses had complained, or to whom they had complained.
It is obvious from the legislative history that Congress did not consider any studies or empirical data estimating the cost of receiving a fax or the number of unsolicited fax advertisements an average business receives in a day before enacting the TCPA. Witnesses at the hearing estimated the cost of receiving one fax, and other witnesses estimated how many faxes their particular business receives on an average. However, there was no evidence as to the actual cost to a particular business over a month or a year. There were only many long hypothetical examples of how much it could cost a business. Mr. Drissel did not testify that these faxes were costing his business a certain amount of dollars. The Court was not told how much he pays for toner and paper or how fast his facsimile machine is, or how much memory his machine has.
Defendants argue that the cost is de minimus, and is even less than it was at the time the statute was enacted in 1991. Defendants argue that expensive paper is no longer needed, as faxes are printed on regular paper, and in some cases, paper has been eliminated all together when faxes are converted into e-mails.[20] The Court does not need to decide if defendant's assertions *930 are correct because the government has the burden to prove that it has a substantial interest. It must prove that the harm it is trying to prevent is real and that a serious problem does in fact exist. See Edenfield, 507 U.S. at 770-71, 776, 113 S.Ct. at 1800, 1803.
Plaintiff claims that "hard evidence" on costs or numbers of unsolicited advertisements is not required. The Supreme Court has stated that "we do not . . . require that empirical data come to us accompanied by a surfeit of background information . . . we have permitted litigants to justify speech restrictions by reference to studies and anecdotes pertaining to different locales altogether, or even . . . to justify restrictions based solely on history, consensus, and `simple common sense'." Florida Bar v. Went For It, Inc., 515 U.S. 618, 628, 115 S.Ct. 2371, 2378, 132 L.Ed.2d 541 (1995). However, in Went For It the plaintiff did submit a 106-page summary of its 2-year study, which included "data both statistical and anecdotal supporting the Bar's contentions." Id. at 626, 115 S.Ct. at 2377. The above quote was simply written in response to Justice Kennedy's dissent which complained that there were no copies of the actual surveys employed. Id. at 628, 115 S.Ct. at 2378. In the present case, there are not even references to studies that support that there is a "serious problem" which the government must address.[21]See Edenfield, 507 U.S. at 776, 113 S.Ct. at 1803.
Plaintiff also asserts that other courts addressing the provision banning unsolicited fax advertisements have found the government's interest substantial. The case law regarding the TCPA's provision banning unsolicited fax advertisements is limited. In 1994, the Oregon District Court noted the "absence of statistical data or national surveys addressing this interest," but nonetheless held that "Congress legitimately relied upon the testimony from authorities,[22] as well as contemporaneous state laws and media reports." Destination Ventures, Ltd. v. Federal Communications Comm'n, 844 F.Supp. 632, 637 (D.Or.1994). It stated that "[d]espite the lack of detailed studies, there were repeated, uncontradicted references made before Congress describing how facsimile advertising shifts economic burdens from the advertiser to the consumer." Id. The Ninth Circuit affirmed the Oregon District Court's decision but did not address the question of whether the government has a substantial interest in cost-shifting. Destination *931 Ventures, Ltd. v. Federal Communications Comm'n, 46 F.3d 54, 55 (9th Cir.1995) (the parties did not contest the government's substantial interest).
The Western District of Texas recently looked at the constitutionality of prohibiting unsolicited fax advertisements. Texas v. American Blastfax, Inc., 121 F.Supp.2d 1085 (W.D.Tex.2000). The court simply quoted the holding of the district court in Destination Ventures, and held that "Blastfax's argument that Congress' hearings were not based on sufficient statistical evidence is unpersuasive." Id. at 1092. The only other district court which has looked at the constitutionality of this issue, did not address whether or not the government's interest was substantial. See Kenro, Inc. v. Fax Daily, Inc., 962 F.Supp. 1162, 1167 (S.D.Ind.1997) (parties did not contest the government's substantial interest).
The Court does not find these district court cases persuasive. The Oregon court found that there were "repeated, uncontroverted references made before Congress." Destination Ventures, 844 F.Supp. at 637. However, the Court fails to see how these "references" satisfy the government's burden in showing a "serious problem." The legislative history is full of studies and statistics related to unsolicited phone calls, however, the reports are glaringly void of any statistical data in reference to unsolicited fax advertisements. H.R.Rep. No. 102-317 (1991) (looking at two telephone company studies, the increase in unlisted numbers, and looking at specifics in state law legislation regulating telemarketers).
The Court was presented with additional evidence of the government's interest in the form of witnesses and exhibits at the hearing. The Court finds that there is a potential for a serious problem to arise without legislative restrictions on unsolicited faxes. However, the Court questions whether the government has met its burden in showing that there was a substantial interest at the time of enacting the TCPA, and whether there is a substantial interest at the present time.
Even if the government could meet its burden of showing a substantial interest, it cannot satisfy the other parts of the Central Hudson test. The Court must also look at whether the regulation directly advances the governmental interest asserted. Central Hudson, 447 U.S. at 566, 100 S.Ct. at 2351. The government must demonstrate that its restrictions will in fact alleviate the harm to a material degree. Edenfield, 507 U.S. at 771, 113 S.Ct. at 1800. In Rubin v. Coors Brewing Co., the Supreme Court held that a law prohibiting the disclosure of alcohol content on beer labels did not directly advance the government's stated interest in preventing "strength wars." 514 U.S. 476, 115 S.Ct. 1585, 131 L.Ed.2d 532 (1995). It pointed out that the law banned disclosure on beer labels but allowed it for wine and other spirits. It went on to state that "if combating strength wars were the goal, we would assume that Congress would regulate disclosure of alcohol content for the strongest beverages as well as for the weakest ones." Id. at 488, 115 S.Ct. at 1592.
The TCPA does not ban all unsolicited faxes, but rather only advertisements. Therefore, recipients can still bear the costs of printing others' messages, even if they strongly oppose the messages' content. The costs of printing political messages, jokes, and even some advertisements which are not included within the TCPA's definition, still fall upon the recipient. For instance, it has been held that an advertisement for job opportunities does not fall within the TCPA's definition, and therefore, is not prohibited by the statute. See Lutz Appellate Servs., Inc. v. Curry, 859 F.Supp. 180 (E.D.Pa.1994). Yet, these *932 messages can still occupy a recipient's fax machine so that the recipient cannot use it for business purposes.
As the Supreme Court has noted, all four parts of the Central Hudson test are interrelated. New Orleans Broad., 527 U.S. at 183-84, 119 S.Ct. at 1930. There is no evidence as to the number of unsolicited faxes the average business receives, and there is no breakdown as to how many of those are advertisements which fall within the TCPA's definition. The evidence at the hearing is a perfect example. Ms. Shaw had more complaints against 21st Century than she did of any other company, but those faxes were not advertising the commercial availability of property, goods or services.[23] In addition, Mr. Little had collected unsolicited faxes sent to the Missouri Attorney General's St. Louis offices, but some of those also failed to fall within the TCPA's definition. There is no evidence as to what type of unsolicited faxes are causing the harm which the government is trying to alleviate, so the Court cannot assess whether the regulation directly advances the government's interest. In addition, both the Washington and Florida Attorney General's offices testified that there was an increase in complaints regarding unsolicited faxes. The Court questions whether the TCPA actually advances the government's interest. If it did, the Court would assume that the complaints would decrease rather than increase.
The government also fails to satisfy the last prong of the Central Hudson test. The regulation cannot be more extensive than necessary. 447 U.S. at 566, 100 S.Ct. at 2351. The law requires there to be a "fit" between the legislature's ends and the means chosen to accomplish those ends a fit that is not necessarily perfect, but reasonable; that represents not necessarily the single best disposition but one whose scope is in proportion to the interest served. Board of Trustees of the State Univ. of N.Y. v. Fox, 492 U.S. 469, 480, 109 S.Ct. 3028, 3035, 106 L.Ed.2d 388. The regulation cannot burden substantially more speech than is necessary to further the government's legitimate interest. Id. at 478, 109 S.Ct. at 3034. The existence of numerous and obvious less-burdensome alternatives to the restriction on commercial speech is a relevant consideration in determining whether the "fit" between ends and means is reasonable. Florida Bar, 515 U.S. at 632, 115 S.Ct. at 2380. The availability of other options which can advance the government's asserted interest in a manner less intrusive to First Amendment rights, indicates that the regulation is more extensive than necessary. Rubin, 514 U.S. at 491, 115 S.Ct. at 1593-94.
Defendants offer a variety of alternatives, including a national "no-fax" data-base similar to those being utilized for telephone solicitations. In fact, the legislative history reveals that the House introduced legislation that would bar unsolicited fax transmissions to "any number which is on record as objecting to the receipt." Telemarketing/Privacy Issues: Hearing Before the Subcommittee on Telecommunications and Finance of the Committee on Energy and Commerce House of Representatives, 102nd Cong. 4 (1991).[24] This alternative would promote the government's *933 interest, and yet be less intrusive to First Amendment rights. Many states have looked at this problem and found less restrictive means than a complete ban on unsolicited fax advertisements.[25]
In City of Cincinnati v. Discovery Network, Inc., Cincinnati wanted to eliminate some newsracks due to safety and aesthetics. 507 U.S. 410, 113 S.Ct. 1505, 123 L.Ed.2d 99 (1993). It decided to prohibit the distribution of commercial handbills, but allowed other publications such as newspapers. The result of the ordinance would have been a removal of 62 newsracks, while about 1,500-2,000 would remain. Id. at 418, 113 S.Ct. at 1510. The Supreme Court agreed with the District Court and the Court of Appeals that the benefit of this restriction was "minute" and "paltry," and therefore, not a proper "fit." Id. It held that the city's categorical ban on commercial newsracks placed too much importance on the distinction between commercial and noncommercial speech, and the distinction beared no relation to the particular interests that the city had asserted. Id. at 424, 113 S.Ct. at 1514.
Again, there is no rationality behind the government's distinction between unsolicited advertisements and other unsolicited faxes. The recipient still must bear the cost, and the fax can still interfere with the recipient's use of his or her facsimile machine for business purposes. Unlike the Supreme Court in Discovery Network, the Court does not know how many unsolicited faxes an average business receives in one day, nor does the Court know how many of those fall within the TCPA's definition of "advertisement." Therefore, it is difficult for the Court to determine if there is a proper "fit." If the majority of unsolicited faxes fall within the category banned by the TCPA, a proper "fit" might be present. However, the Court questions whether there is a proper fit because of the increase in complaints after the TCPA was enacted. It appears that the complaints regarding this problem should have decreased if in fact there was a proper "fit." The Court finds that the government fails to meet its burden of showing that a complete ban on unsolicited advertisements is not more extensive than necessary to respond to the government's interests.[26]
The government simply fails to meet its burden of demonstrating that the harms it recites are real and that its restriction will in fact alleviate them to a material degree. See Edenfield, 507 U.S. at 770, 113 S.Ct. at 1800. Review of the legislative history reveals no evidence that there is a "serious problem," and the evidence at the hearing only reveals that there is the potential for *934 a serious problem. The government also fails to show that the regulations are no more extensive than is necessary to serve the government's interests. Therefore, the Court holds that 47 U.S.C. § 227(b)(1)(C) is unconstitutional as it violates the First Amendment's guarantee of freedom of speech.

III. Missouri Merchandising Practices Act
The government alleges that defendants violated the Missouri Merchandising Practices Act (MPA) by "misrepresenting, directly or by implication, to Missouri consumers that the fax messages were sent in accordance with federal law, when in fact, sending of unsolicited advertisements via telephone facsimile machine violates 47 U.S.C. § 227." Complaint against American Blast Fax, ¶ 24; Complaint against Fax.com, ¶ 26. The government's argument assumes that defendants violated the provision of TCPA prohibiting unsolicited advertisement faxes. Since the Court has already decided that this provision is unconstitutional, the government's claim pursuant to the MPA must also fail.
Even if § 227(b)(1)(C) was constitutional, the MPA claim against defendants would still be dismissed for failure to state a claim. The MPA prohibits the use of misrepresentation in connection with the advertisement of any merchandise. Mo.Rev.Stat. § 407.020(1). However, the Attorney General does not allege that any of the advertisements faxed by the defendants are false or misleading. In its Response, the Attorney General alleges that defendants by sending fax advertisements, represent that they have permission to send the faxes. Response to Fax.com's Motion to Dismiss, at 19. It argues that this activity is a misrepresentation of fact, just as when an entity purposefully sends a consumer an item the consumer did not order, and then attempts to bill the consumer for the item. The Court finds this analogy unpersuasive. Even if defendants' conduct in sending unsolicited fax advertisements was found to be in violation of the TCPA, the Court fails to see how this conduct is prohibited under the MPA.

Conclusion
Applying the Central Hudson standard to the prohibition of unsolicited fax advertisements, the government fails to meet its burden in demonstrating that the harms it recites are real and that its restrictions will in fact alleviate them to a material degree. Furthermore, the government's claim under the MPA was based on the assumption that defendants violated the TCPA. Since the Court finds that the provision prohibiting the sending of unsolicited advertisements is unconstitutional, the MPA claim must also fail.
NOTES
[1] This motion was document # 16 in Case No. 4:00cv1265LOD. The cases were consolidated, but the parties were not required to re-file motions already pending in those cases. Therefore, the motion does not have a document number in the current cause of action, Case No. 4:00cv933SNL.
[2] Throughout this opinion, the Court continuously refers to the TCPA. When it makes such a reference, it is only referring to the faxing prohibition in § 227, and not the entire statute.
[3] There has been some indication that American Blast Fax, Inc. is no longer in business, but there is nothing on the record to this effect.
[4] Counsel for American Blast Fax, Incorporated withdrew March 7, 2001, and since then, no attorney has entered an appearance for American Blast Fax. After counsel's withdrawal, the Court began to send its orders directly to American Blast Fax, but all of the mail was returned. The other parties in the lawsuit have indicated that they have been unable to reach Blast Fax, and their correspondence has also been returned. At the beginning of the hearing, the Court asked if there was anyone in the courtroom who wished to appear either as counsel or as a representative of American Blast Fax, and nobody responded.
[5] These numbers were based on a variety of estimates. He estimated that one advertisement used four times as much toner as a "Slerexe" letter, and therefore, he multiplied the cost of toner for a "Slerexe" letter by four. Even the witness stressed in his testimony "it would be my estimate and it'sit is just that, an estimate, at probably somewhere around . . ." and went on to give his calculation.
[6] The witness testified that to his knowledge no one in the Attorney General's office requested these faxes, but he did not ask the people who worked in the area of the facsimile machines if they requested any of these faxes. One fax specifically stated in its transmittal line that it was "To Attorney General."
[7] Defendants argue that § 227 is void for vagueness. Although defendants arguments appear to have some merit, the Court will not address this issue. The hearing was only in regards to the Central Hudson standard, and the United States was not given an opportunity to address this issue.
[8] There is no indication what type of faxes Mr. Drissel was referring to when he said he was receiving a certain number of faxes. Counsel for the State asked ". . . how many faxes per day on average would you receive?" The Court can infer that the faxes were unsolicited by a couple answers later when Mr. Drissel stated that he tried "to get them stopped." However, there is no explanation if all of these faxes were advertisements or would even remotely be covered under the TCPA. See Tr. Transcript Vol. I, at 110.
[9] Testimony was later given by Mr. Kauffman which stated that 95% of J2's four million customers were not paying for their service suggesting that most of its customers are on the heavily populated T-1 lines. J2 makes its money from phone companies, advertisers, and from people who pay them for their customers's e-mail addresses.
[10] There was testimony that the fax machine would not have called back to the same number, but rather would have recognized that the phone number was not a fax number and would have stopped calling.
[11] Both Florida and Washington have state laws prohibiting unsolicited faxes, and so much of their testimony concerned complaints and violations of those state laws. The state laws have some overlap with the TCPA, however.
[12] Mr. Buchner indicated that over the last seven years, complaints concerning unsolicited fax advertisements increased. Ms. Shaw indicated that there had been an increase "over the past few years."
[13] Defendants do not bear the burden, and therefore, their witnesses' testimony was not as critical.
[14] Plaintiff and intervenor objected to this witness's testimony because he was tendered as an expert and they were not provided a resume and report pursuant to Federal Rule of Civil Procedure 26(a)(2). However, this was not a trial, but rather only a hearing, and under the unusual circumstances of the case, the Court held that the witness could still testify. Interestingly, the State's first witness, Mr. Houser, discussed industry standards, and gave opinions on how long it takes a fax to transmit and the cost of sending such a fax. In addition, Mr. Kauffman's testimony rebutted Mr. Houser's and Mr. McLauchlan's testimony. Finally, as the Court noted at the hearing after the witness had finished testifying, the majority of his testimony was based upon statistics and information that was available on the market. For these reasons, the Court held that the parties would not be unfairly prejudiced by Mr. Kauffman's testimony.
[15] Not only is Mr. Kauffman an expert on faxes and facsimile machines, he also happens to be involved in the Direct Marketing Association and has quite a bit of experience in the direct marketing area. He has written in many publications, as well as spoken at various marketing conferences.
[16] Commercial speech is defined as "speech which does no more than propose a commercial transaction." Bolger, 463 U.S. at 66, 103 S.Ct. at 2880. Advertisements by definition qualify as commercial speech.
[17] The statute makes no distinction between those faxes which are misleading, and those which are not. The faxes on record that were sent by 21st Century Fax, and testified to by Ms. Shaw, might be misleading, in which case, those faxes would not be protected and the government would have unlimited authority to prohibit such faxes. There have been no allegations that the advertisements sent by American Blast Fax and Fax.com are misleading or concern unlawful activity. The State of Missouri originally alleged that they were misleading because it argued that the faxes lead consumers to believe that it is their responsibility to prevent unsolicited fax advertising by offering a number which consumers can call to be removed from defendants' data-base. However, the advertisements themselves are the commercial speech which the Court is analyzing, and as stated above, there are no allegations that the actual advertisements are misleading.
[18] The witnesses at the hearing appeared to agree that the cost of one sheet of paper is now half a cent.
[19] The evidence presented at the hearing showed that it no longer takes several minutes to process a single page fax. The evidence indicated that it could take as much time as 30 seconds, but more often it takes 3 to 6 seconds to process. The "sophisticated and expensive" facsimile machines are more common now as compared to 1991, and even a lower end fax machine can hold in its memory 60 to 80 pages.
[20] J2 Global does this for apparently three million people in the United States. There was some testimony that more companies like J2 will begin to emerge soon, and the majority of people will switch to this type of faxing. However, at the present time, most people use the standard facsimile machine and the faxes are printed out on paper.
[21] The only empirical studies referred to in the legislative history were in connection with telemarketing phone calls. There were no studies regarding unsolicited fax advertisements.
[22] This testimony included three witness who simply stated that junk faxes are a "nuisance." The statement by Thomas Beard, on behalf of National Association of Regulatory Utility Commissioners (NARUC), included the most extensive comment on junk faxes.

The junk fax problem is a more recent situation and I do not believe many States have passed legislation on this issue. The junk fax advertiser is a nuisance who wants to print their ad[] on your paper. That call also seizes your fax machine so that it is not available for calls you want or need. The NARUC recently ran into this problem and I have attached the ad to this statement. As fax machines have become faster and easier to use, use of this form of communication has shown tremendous growth. Although I have seen no figures on national usage, I am judging by my own increasing reliance on the fax.
Hearing Before House Subcommittee on Telecommunications and Finance, 102nd Cong. 31 (1991) (emphasis added). Ironically enough, the NARUC included a resolution supporting the Act which prohibited the use of facsimile machines to send "unsolicited advertisements to persons who specifically object." Id. at 74, App. D (emphasis added). The TCPA goes farther than that and requires that the advertiser get express permission. 47 U.S.C. § 227(a)(4).
[23] Ms. Shaw testified that her office had received 100 complaints regarding 21st Century, as compared to 70 regarding Fax.com and 40-50 regarding American Blast Fax. The faxes sent from 21st Century consisted of polls and "Get Paid to Enjoy Yourself" "Get Paid to Diet" faxes.
[24] Before passing the TCPA in 1991, Congress considered several bills containing limited restrictions on sending unsolicited faxes. These restrictions were more narrowly drawn than what the TCPA presently dictates. It is unclear how or why Congress adopted the more stringent language.
[25] See CA Bus. & Prof. § 17538.4 (unsolicited fax advertisements must contain a toll-free number in 9 pt. type which recipient may call to indicate a desire not to receive such faxes); Tenn Code Ann. § 47-18-2501(a) (same); Minn.Stat. § 325E.395(a)-(b) (same, but also must include address where recipient can write); Colo.Rev.Stat. § 6-1-702(b)(I),(II) (must include a toll-free number); N.Y. Gen. Bus. § 396-aa(1) (unsolicited fax may be no longer than 5 pages and must be received between 9p.m. and 6a.m.); N.D. Cent.Code § 51-07-23 (same time restriction and may be no longer than 2 pages); Or.Rev.Stat. § 646.872(1) (faxes permitted unless recipient has sent notice that he or she does not wish to receive the faxes); R.I. Gen. Laws § 6-47-1(a) (must contain toll-free number in at least 9 pt. type and in same font as body of transmission, and this information must be the first printed material on the faxes).
[26] The government argues that the TCPA is not a complete ban because it allows fax advertisements to be sent if the consumer gives express permission. However, there is no practical way for companies to gain permission. They could fax a request form to the consumer asking for permission, and forcing the consumer to fax something back to the company, but that does not seem sensible. Therefore, for all practical purposes the language of the TCPA is a complete ban on facsimile advertising.